IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

INFERNAL TECHNOLOGY, LLC.,      (   CAUSE NO. 2:19-CV-248-JRG
and TERMINAL REALITY, INC.,     )
          Plaintiffs,           (
                                )
vs.                             (
                                )
SONY INTERACTIVE ENTERTAINMENT, (
LLC.,                           )   OCTOBER 7, 2021
                                (   MARSHALL, TEXAS
          Defendants,           )   9:00 A.M.

_____


VOLUME 4


_____


TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____


SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 237-7464
shawn_mcroberts@txed.uscourts.gov

1

<u>A P P E A R A N C E S</u>

2

FOR PLAINTIFFS:            BUETHER JOE & COUNSELORS, LLC
3                          1700 PACIFIC AVENUE, STE. 4750
                           DALLAS, TEXAS  75201
4                          (214) 466-1272
                           BY:  MR. CHRISTOPHER JOE
5                               MR. ERIC BUETHER
                                MR. KENNETH KULA
6

FOR DEFENDANT:            ERISE IP, PA - OVERLAND PARK
7                          7015 COLLEGE BLVD., SUITE 700
                           OVERLAND PARK, KANSAS  66211
8                          (913) 777-5600
                           BY:  MR. ERIC BURESH
9                               MS. MICHELLE MARRIOTT
                                MR. MARK LANG
10

                           GILLAM & SMITH, LLP
11                         303 SOUTH WASHINGTON AVENUE
                           MARSHALL, TEXAS  75670
12                         (903) 934-8450
                           BY:  MS. MELISSA SMITH
13

OFFICIAL REPORTER:       SHAWN M. McROBERTS, RMR, CRR
14                         100 E. HOUSTON STREET
                           MARSHALL, TEXAS  75670
15                         (903) 923-7464

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Be seated, please.

2     After the jury was excused yesterday late afternoon or

3 early evening, the Court took up, considered, and ruled on

4 motions offered pursuant to Rule 50(a) of the Federal Rules of

5 Civil Procedure as urged by both sides.

6     Subsequent to addressing motions under Rule 50(a), the

7 Court then held yesterday evening an informal charge

8 conference in chambers where the Court reviewed with counsel

9 openly and in a fulsome manner the then existing, most current

10 submission from the parties regarding the final jury

11 instructions and verdict form.

12     The Court received material input from counsel regarding

13 the charge and the verdict form.  The Court engaged in

14 questions and answers and discussions with counsel, and the

15 informal charge conference was free-flowing and materially

16 helpful.  The Court took those comments and inputs into

17 consideration and overnight generated what the Court believes

18 to be the appropriate and proper final jury instruction and

19 verdict form for use in this case.

20     This morning printed copies of those documents were

21 generated and delivered to counsel for the parties who have

22 since had ample opportunity to review and consider the same,

23 and the Court is now prepared to conduct a formal charge

24 conference on the record to review the final jury instructions

25 and verdict form and entertain any objections on the record

1    that either Plaintiffs or Defendant care to offer.

2        With that, counsel, I'm going to ask a single

3    spokesperson for Plaintiffs and a single spokesperson for

4    Defendant to go to the podium, and we'll begin with the final

5    jury instructions.

6        My practice is to review these on a page-by-page basis,

7    and at any point as we go through the documents page-by-page

8    that you believe something should be objected to, then you'll

9    have an opportunity to make those objections, both as to

10   whatever is included and to anything that you believe has been

11   excluded that should have been included.

12       And we'll do that, as I say, on a page-by-page basis so

13   that we ensure nothing is overlooked or unintentionally

14   skipped.  Then we'll proceed to do the same thing in the same

15   approach with the verdict form.

16       So with that, who's going -- I assume you're going to

17   speak for Plaintiff, Mr. Joe?  If you'll go to the podium.

18       Mr. Lang, are you going to represent defendant?

19           MR. LANG:  Correct, Your Honor.

20           THE COURT:  All right.  Why don't you two gentlemen

21   go to the podium.  And we'll turn to the final jury

22   instructions first, beginning with the front page or first

23   page, and I'll ask if either Plaintiff or Defendant has any

24   objections to anything on this first page of the final jury

25   instructions.

1          MR. JOE:  No objection from Plaintiff, Your Honor.

2          THE COURT:  And from Defendant?

3          MR. LANG:  None, Your Honor.

4          THE COURT:  All right.  Turning then to page 2 of

5   the final jury instructions, is there objection here from

6   either Plaintiffs or Defendant?

7          MR. JOE:  No objection from Plaintiff.

8          MR. LANG:  No objection from Defendant.

9          THE COURT:  Next is page 3.  Is there any objection

10  here?

11         MR. JOE:  No objection from Plaintiff.

12         MR. LANG:  None from Defendant.

13         THE COURT:  Next is page 4.  Is there any objection

14  here?

15         MR. JOE:  No objection from Plaintiff.

16         MR. LANG:  No objection from Defendant.

17         THE COURT:  Turning then to page 5 of the final jury

18  instructions, is there objection here from either party?

19         MR. JOE:  Plaintiff has no objection.

20         MR. LANG:  No objection from Defendant.

21         THE COURT:  Next is page 6.  Is there any objection?

22         MR. JOE:  No objection from Plaintiff.

23         MR. LANG:  No objection from Defendant.

24         THE COURT:  Next is page 7.  Is there any objection?

25         MR. JOE:  No objection from Plaintiff.

1           MR. LANG:  None from Defendant.

2           THE COURT:  Next is page 8.  Is there any objection?

3           MR. JOE:  No objection from Plaintiff.

4           MR. LANG:  No objection from Defendant.

5           THE COURT:  Turning then to page 9 of the final jury

6   instructions, is there objection here from either party?

7           MR. JOE:  Your Honor, Plaintiffs object to the

8   instructions regarding patent ineligibility for the reasons

9   stated yesterday by Mr. Buether in that the -- it's not

10  supported by the evidence.

11          THE COURT:  All right.  That objection is overruled.

12      Is there any other objection from either party as to

13  anything on page 9?

14          MR. JOE:  No other objections, Your Honor.

15          MR. LANG:  No objection from Defendant.

16          THE COURT:  Turning then to page 10, is there

17  objection here from either party?

18          MR. JOE:  No objection from Plaintiff.

19          MR. LANG:  No objection from Defendant.

20          THE COURT:  Next is page 11.  Is there any objection

21  here?

22          MR. JOE:  No objection from Plaintiff.

23          MR. LANG:  No objection from Defendant.

24          THE COURT:  Next is page 12.  Is there objection

25  here from either party?

1          MR. JOE:  No objection from Plaintiff.

2          MR. LANG:  No objection from Defendant.

3          THE COURT:  Next then is page 13.  Is there any

4    objection here?

5          MR. JOE:  Your Honor, Plaintiff would object to

6    the -- again to the instruction on patent ineligibility as not

7    supported by the evidence.

8          THE COURT:  All right.  That objection is overruled.

9      Is there any further objection from either party to

10   anything included upon or omitted from page 13?

11         MR. JOE:  No.  No further objections.

12         MR. LANG:  Your Honor, Defendant objects to the

13   final sentence of the first, I guess, partial paragraph on

14   page 13 reading -- starting, an accused product infringes

15   an apparatus claim if it's reasonably capable of satisfying

16   the claim element.

17         THE COURT:  All right.  Anything further on page 13

18   from either Plaintiffs or Defendant?

19         MR. JOE:  No, Your Honor.

20         MR. LANG:  None from Defendant, Your Honor.

21         THE COURT:  Okay.  Defendant's objection on page 13

22   is overruled.

23      We'll turn then to page 14.  Is there any objection here

24   from either party?

25         MR. JOE:  Two objections, Your Honor.  First, the

1    same one I asserted earlier with respect to the eligibility in

2    that there's no evidence to support the instruction.

3        And, secondly, Your Honor, last night I did have the

4    opportunity to go back through Mr. Randel's trial testimony,

5    and he did provide some testimony that indicated that he came

6    up with the invention in 1997.  I have a copy if Your Honor

7    would look at it.

8        And so to finish the thought, Your Honor, so we would

9    object to the date March 1999 as not supported by the record

10   and improper in light of that evidence, in light of that

11   testimony.

12           THE COURT:  And you believe the proper date would be

13   what?

14           MR. JOE:  May 8, 1997.

15           THE COURT:  That objection is overruled.  Anything

16   else from either party on page 14?

17           MR. JOE:  No other objections, Your Honor.

18           MR. LANG:  No objections from Defendant, Your Honor.

19           THE COURT:  Turning then to page 15, is there

20   objection here from either party?

21           MR. JOE:  No objections from Plaintiff.

22           MR. LANG:  None from Defendant.

23           THE COURT:  Turning then to page 16, which is the

24   final page of the charge to the jury or final jury

25   instructions, is there objection here from either party?

```
 1              MR. JOE:  No objection from Plaintiff.

 2              MR. LANG:  No objection from Defendant, Your Honor.

 3              THE COURT:  All right.  Turning next to the verdict

 4    form, we'll follow the same approach here, counsel.  Beginning

 5    with the first page or the front page of the verdict form, is

 6    there objection here from either party?

 7              MR. JOE:  No objection from Plaintiff.

 8              MR. LANG:  No objection from Defendant.

 9              THE COURT:  Turning then to page 2 of the verdict

10    form where various definitions are set forth, is there

11    objection here from either party?

12              MR. JOE:  No objection from Plaintiff.

13              MR. LANG:  No objection from Defendant.

14              THE COURT:  Next is page 3 of the verdict form where

15    instructions are given.  Is there objection to anything on

16    page 3 of the verdict form from either Plaintiff or Defendant?

17              MR. JOE:  No objection from Plaintiff.

18              MR. LANG:  No objection from Defendant.

19              THE COURT:  Next is page 4 of the verdict form

20    wherein Question 1 regarding infringement is found.  Is there

21    objection here from either party?

22              MR. JOE:  No objection from Plaintiff.

23              MR. LANG:  No objection from Defendant.

24              THE COURT:  All right.  Next is page 5 of the

25    verdict form wherein Question 2 regarding patent eligibility
```

1        is located.

2              MR. JOE:  Just the same objection, Your Honor.

3        Question No. 2 relates to patent eligibility or ineligibility.

4        Plaintiffs object because they believe the evidence does not

5        support the question.

6              Secondly, this is more of a grammatical issue.  I know

7        the parties submitted it this way, but I think the only should

8        probably modify technologies and activities, so it should read

9        involve only technologies and activities and as opposed to

10       only involve.

11             THE COURT:  All right.  Well, with regard to your

12       first objection, Mr. Joe, that's overruled.

13             With regard to your second objection, as I appreciate it,

14       you're suggesting that with regard to the question itself, the

15       second line of the question as printed should read, involve

16       only technologies rather than only involve technologies as

17       it's stated now.

18             Is that your objection?

19             MR. JOE:  Yes, Your Honor, that the only appears to

20       now modify the verb involve as opposed to modifying the

21       subject technologies and activities.

22             THE COURT:  All right.  While I consider that, let

23       me inquire if Defendant has any objection to anything on page

24       5 regarding Question 2 of the verdict form.

25             MR. LANG:  Defendant does not have any objections,

1    Your Honor.

2            THE COURT:  I'm going to accept your suggestion, Mr.

3    Joe, on Question 2 with regard to the order of the language,

4    and I will change that from asserted claims only involve to

5    asserted claims involve only.

6            MR. JOE:  Thank you, Your Honor.

7            THE COURT:  Otherwise, your objections are

8    overruled.

9        Turning, then, to page 6, which is the final page of the

10   verdict form, is there objection here from either party?

11           MR. JOE:  No objection from Plaintiff.

12           MR. LANG:  No objection from Defendant.

13           THE COURT:  All right.  Thank you, counsel.  That

14   will complete the formal charge conference.  I'll now recess.

15       During the recess, I'll prepare eight printed copies of

16   the final jury instructions to deliver to the jury, together

17   with one clean copy of the verdict form after I've given them

18   my final instructions orally and we've all heard closing

19   arguments for counsel for the parties and at the time I

20   instruct the jury to retire and deliberate upon its verdict.

21       The Court stands in recess.

22                     (Brief recess.)

23           THE COURT:  Be seated, please.

24       Counsel, are the parties prepared to read into the record

25   those items from the list of pre-admitted exhibits used during

1    yesterday's portion of the trial?

2            MR. BUETHER:  Yes.  I don't believe the Plaintiff

3    had any, but we're ready.

4            THE COURT:  Well, if that's your announcement, I'll

5    accept that, Mr. Buether.

6        Do Defendants have any items from the list of

7    pre-admitted exhibits to read into the record from yesterday's

8    portion of the trial?

9            MR. LANG:  Working on it, Your Honor.

10           THE COURT:  All right.

11           MR. LANG:  Sorry.

12           THE COURT:  Go ahead, Mr. Lang.

13           MR. LANG:  Thank you, Your Honor.  Yesterday

14   Defendants introduced DX 4, DX 63, DX 169, and DX 272.

15           THE COURT:  Any objection to that rendition from the

16   Plaintiffs?

17           MR. BUETHER:  No objection.

18           THE COURT:  All right.  Thank you, counsel.

19       Before I bring the jury in, let me remind our visitors in

20   the gallery that, in the Court's view, its final instructions

21   to the jury and counsels' closing arguments are the most

22   serious part of a very serious process.             Therefore, I

23   don't want any disruptions, I don't want people coming and

24   going from the courtroom, I don't want people shifting around

25   or shuffling papers.  I want you to be as still and as focused

1    and as respectful as possible.  If anyone is present who needs

2    to leave the courtroom, do it now before I bring the jury in.

3        Mr. Buether, with regard to Plaintiffs' closing argument,

4    do you have a request with regard to how to divide your time

5    and what warnings on your time you may wish to have?

6            MR. BUETHER:  Yes.  That's 33/7 would be the split,

7    and a 5 and 8 warning.

8            THE COURT:  Five and eight?

9            MR. BUETHER:  Yes.

10           THE COURT:  All right.  You mean by that eight

11   minutes until the end of the first 33, and then five minutes

12   from the end of the first 33 minutes for your first closing

13   argument?

14           MR. BUETHER:  If I can get two notices, that would

15   be real nice.  Yes, Your Honor.

16           THE COURT:  All right.  And with regard to your

17   second closing, assuming you use exactly 33 minutes and

18   there's seven minutes left, what would you like there?

19           MR. BUETHER:  Two minutes on whatever is left.

20           THE COURT:  Two minutes on whatever's left.  All

21   right.

22       Mr. Buresh, do you have a similar request of any kind?

23           MR. BURESH:  No, Your Honor.

24           THE COURT:  You don't want me to tell you when you

25   have two minutes or one minute or --

1        MR. BURESH:  I'm going to have my own clock running.

2        THE COURT:  That's fine.  That's fine.

3    All right.  Is either party aware of anything else the

4    Court should consider or take up before I bring in the jury

5    and proceed with final jury instructions?

6        MR. BUETHER:  No, Your Honor.

7        THE COURT:  Anything from Defendant?

8        MR. BURESH:  No, Your Honor.

9        THE COURT:  All right.  Let's bring in the jury,

10   please, Mr. Fitzpatrick.

11       THE COURT SECURITY OFFICER:  Yes, sir.

12       (Whereupon, the jury entered the courtroom.)

13       THE COURT:  Good morning, ladies and gentlemen.

14   Please be seated.

15   Ladies and gentlemen of the Jury:

16   You've now heard all the evidence in this case, and I

17   will now instruct you on the law that you must apply.

18   Each of you, as I told you yesterday, are going to have

19   your own printed copy of these final jury instructions that

20   I'm about to give you orally.  Therefore, there's no pressing

21   need for you to take notes unless you particularly want to.

22   It's your duty to follow the law as I give it to you.  On

23   the other hand, and as I've said, you the jury, are the sole

24   judges of the facts in this case.  You should not consider any

25   statement that I have made over the course of the trial or may

1    make as a part of the instructions that I'm now giving you as

2    an indication that the Court has any opinion about what the

3    facts are in this case.

4         You are about to hear closing arguments from the

5    attorneys for the competing parties.  Statements and arguments

6    of the attorneys are not evidence, and they are not

7    instructions on the law.  They are intended only to assist the

8    jury in understanding the evidence and the parties' competing

9    contentions.

10        A verdict form has been prepared for you.  And you will

11   take this verdict form to the jury room when you retire to

12   deliberate.  And when you have reached a unanimous agreement

13   as to the questions in the verdict form, you will have your

14   foreperson fill in those unanimous answers in the blanks

15   provided in the verdict form.  Then your foreperson will sign

16   the verdict form, date it, and then notify the Court security

17   officer that you've reached a verdict.

18        You should answer the questions in the verdict form from

19   the facts as you find them to be.  You should not, ladies and

20   gentlemen, decide who you think should win this case and then

21   answer the questions to reach that result.  Your answers and

22   your verdict, I'll remind you, must be unanimous.

23        Now, in deciding whether any facts have been proven in

24   this case, you may, unless otherwise instructed, consider the

25   testimony of all the witnesses, regardless of who may have

called them, and you may consider all the exhibits received

and admitted into evidence over the course of the trial,

regardless of who may have introduced that exhibit or those

exhibits.

You, the jury, are the sole judges of the credibility of

all the witnesses and the weight and effect to give to all the

evidence.  In deciding the facts in this case, you may have to

decide which testimony to believe and which testimony not to

believe.  You alone are to determine the questions of

credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may

consider the witness' manner and demeanor on the witness

stand, any feelings or interest they may have in the case, any

prejudice or bias about the case that the witness may have,

and the consistency or inconsistency of their testimony,

considered in the light of the circumstances.  Has the witness

been contradicted by other evidence?  Has he or she made

statements at other times and places contrary to what he or

she said on the witness stand?  You must give the testimony of

each witness the amount of credibility that you think it

deserves.

You must also keep in mind, ladies and gentlemen, that a

simple mistake does not mean the witness is not telling the

truth.  You must consider whether any misstatement was an

intentional falsehood or a simple lapse in memory and what

1    significance should be attached to that testimony.

2         As I've told you previously, the attorneys in this case

3    are advocates for the competing parties, and they have a duty

4    to object when they believe evidence is offered that should

5    not be admitted under the rules of the Court.

6         When the Court sustained an objection to a question

7    addressed to a witness, you must disregard that question

8    entirely, and you may draw no inference from its wording or

9    speculate about what the witness would have said if he or she

10   had been permitted by the Court to answer the question.  If,

11   on the other hand, the objection was overruled by the Court,

12   then you may treat the question and the answer just as if it

13   was any other question and answer and as if no objection had

14   been made.

15        Now, by allowing the testimony or other evidence to be

16   introduced over the objection of an attorney, the Court did

17   not indicate any opinion as to the weight or effect of that

18   evidence.

19        Now, at times during the trial, it was necessary for the

20   Court to talk with the lawyers outside of your hearing either

21   by calling a recess and talking to them while you were outside

22   of the courtroom, or by calling them to the bench and talking

23   to them outside of your hearing.  This happens because during

24   trials things arise which do not directly involve the jury.

25   You should not speculate about what was said during such

1   discussions that took place outside of your presence.

2        Now, there are two types of evidence that you may

3   consider in properly finding the truth as to the facts in this

4   case.  One is direct evidence, such as the testimony of an

5   eyewitness.  The other is indirect or circumstantial evidence,

6   that is, the proof of a chain of circumstances that indicates

7   the existence or non-existence of certain other facts.  As a

8   general rule, ladies and gentlemen, the law makes no

9   distinction between direct evidence or circumstantial

10  evidence, but simply requires that you, the jury, find the

11  facts based on the evidence presented, both direct and

12  circumstantial.

13       Now, the parties in this case have stipulated or agreed

14  to some certain facts in this case.  And when the lawyers on

15  both sides stipulate as to the existence of a fact, you must,

16  unless otherwise instructed, accept that stipulation as

17  evidence and regard that fact as proven.

18       These facts are not disputed between the parties and they

19  have stipulated as follows:

20       1.  Plaintiff Terminal Reality, Inc., is a Texas

21  corporation, having its principal place of business in Flower

22  Mound, Texas.

23       Plaintiff Infernal Technology, LLC, is a Texas limited

24  liability company, having its principal place of business in

25  Dallas, Texas.

1          Defendant Sony Interactive Entertainment, LLC, is a

2   limited liability company organized under the laws of the

3   state of California, having its principal place of business in

4   San Mateo, California.

5          Terminal Reality is the owner of United States Patent No.

6   6,362,822, which you heard referred to throughout trial as the

7   '822 Patent.  And Terminal Reality is the owner of United

8   States Patent No. 7,061,488, which you've heard referred to as

9   the '488 Patent.  You've also heard these referred to and I

10  will refer to them as the Patents-in-Suit or as the asserted

11  patents.

12         Next, Infernal Technology is the exclusive licensee of

13  these asserted patents.

14         Next, the '822 Patent, entitled Lighting and Shadowing

15  Methods and Arrangements for Use in Computer Graphic

16  Simulations, issued on March the 26th, 2002, with Mark R.

17  Randel as the named inventor.

18         Next, the '488 Patent entitled Lighting and Shadowing

19  Methods and Arrangements for Use in Computer Graphic

20  Simulations, issued on June the 13th, 2006, with Mark R.

21  Randel as the named inventor and is a continuation of the '822

22  Patent.

23         Next, Plaintiff filed their complaint in this case on

24  July the 11th, 2019.

25         Next, the asserted patents expired on March the 12th,

1    2019, and the patent laws permit the recovery for acts of

2    infringement up to six years prior to the filing of an

3    infringement suit.  In this case, that date would be July the

4    11th, 2013.

5          Those are the stipulations of the parties.

6          Now, certain testimony in this case has been presented to

7    you through depositions.  A deposition is the sworn, recorded

8    answers to questions asked to a witness in advance of the

9    trial.  If a witness can't be present to testify in person

10   from the witness stand, the witness' testimony may be

11   presented under oath in the form of a deposition.

12         Before the trial began, the attorneys representing the

13   competing parties in this case questioned these deposition

14   witnesses who were placed under oath.  A court reporter was

15   present and their testimony was recorded.  Deposition

16   testimony, ladies and gentlemen, is entitled to the same

17   consideration as testimony given by a witness in person from

18   the witness stand.  Accordingly, you should determine the

19   credibility and importance of deposition testimony to the very

20   best of your ability, just as if the witness had testified in

21   open court.

22         Now, while you should consider only the evidence in this

23   case, you are permitted to draw such reasonable inferences

24   from the testimony and exhibits as you feel are justified in

25   the light of common experience.  In other words, and said

1    another way, you may make deductions and you may reach

2    conclusions that reason and common sense lead you to draw from

3    the facts that have been established by the testimony and

4    evidence in this case.  However, you should not base your

5    decisions on any evidence not presented by the parties during

6    this case, including your own personal experience with any of

7    the products that are at issue in this case.

8        Now, unless I instruct you otherwise, you may properly

9    determine that the testimony of a single witness may be

10   sufficient to prove any fact, even if a greater number of

11   witnesses may have testified to the contrary if, after

12   considering all of the evidence, you believe that single

13   witness.

14       When knowledge of a technical subject may be helpful to

15   the jury, a person who has special training and experience in

16   that technical field, we call them an expert witness, is

17   permitted to state his or her opinions on those technical

18   matters.  However, ladies and gentlemen, you are not required

19   to accept any expert witness' opinion.  As with all the

20   witnesses, it's solely up to you to decide whether to rely on

21   their testimony or not to rely on their testimony.

22       Now, certain exhibits have been shown to you during the

23   trial that were illustrations.  We call these types of

24   exhibits demonstrative exhibits or sometimes simply

25   demonstratives.  Demonstrative exhibits are a party's

1    depiction, picture, or model to describe something involved in

2    the trial.  If your recollection of the evidence differs from

3    these demonstratives, you should rely on your recollection of

4    the evidence.  Demonstrative exhibits are sometimes called

5    jury aids.  Demonstratives themselves, ladies and gentlemen,

6    are not evidence, but the witness' testimony concerning a

7    demonstrative exhibit is evidence.  These demonstratives will

8    not be available for you to review during your deliberations.

9        Now, in any legal action, facts must be proven by a

10   required amount of evidence known as the burden of proof.  The

11   burden of proof in this case is on the Plaintiffs for some

12   issues and on the Defendant for other issues.  There are two

13   burdens of proof that you will apply in this case.  They are

14   the preponderance of the evidence and clear and convincing

15   evidence.

16       The Plaintiffs in this case, Infernal Technology and

17   Terminal Reality, who you've heard referred to collectively

18   throughout the trial as the Plaintiffs, have the burden of

19   proving patent infringement by a preponderance of the

20   evidence.  A preponderance of the evidence means the evidence

21   that persuades you that their claim is more probably true than

22   not true.  Sometimes this is talked about as being the greater

23   weight and degree of credible testimony.

24       Now, the Defendant in this case, Sony Interactive

25   Entertainment, which you've heard referred to as the

1    Defendant, you've also heard them called SIE or Sony, the

2    Defendant has the burden of proving ineligibility of the

3    Plaintiffs' patent claims by clear and convincing evidence.

4        Clear and convincing evidence means evidence that

5    produces in your mind an abiding conviction that the truth of

6    the party's factual contentions are highly probable.  Although

7    proof to an absolute certainty is not required, ladies and

8    gentlemen, the clear and convincing evidence standard requires

9    a greater degree of persuasion than is necessary to meet the

10   preponderance of the evidence standard.  If proof establishes

11   in your mind an abiding conviction in the truth of the matter,

12   then the clear and convincing evidence standard has been met.

13       Now, as I've previously told you, these two burdens of

14   proof are not to be confused with the separate and different

15   burden of proof known as beyond a reasonable doubt, which is

16   the burden of proof applied in a criminal case and which has

17   no application whatsoever in a civil case such as this.

18   Beyond a reasonable doubt is a higher burden of proof than

19   clear and convincing evidence and you should not confuse those

20   two.  And clear and convincing evidence is a higher burden of

21   proof than the preponderance of the evidence.

22       Now, in determining whether any fact has been proven by a

23   preponderance of the evidence or by clear and convincing

24   evidence, you may, unless otherwise instructed, consider the

25   stipulations of the parties; the testimony of all the

1    witnesses, regardless of who called them; and all the exhibits

2    received and admitted into evidence over the course of the

3    trial, regardless of who may have introduced those exhibits.

4        Now, as I did at the beginning of the case, I'll first

5    give you a summary of each side's contentions in this case,

6    and I'll then provide you with detailed instructions on what

7    each side must prove in order to win on each of its

8    contentions.

9        As I previously told you, this is an action for patent

10    infringement.  Plaintiffs contend that the Defendant has

11    infringed certain claims of the Patents-in-Suit.  Remember,

12    there are two Patents-in-Suit:  The '822 Patent and the '488

13    Patent.

14        Plaintiffs contend that the Defendant infringes the

15    following claims of the asserted patents:  Claim 1 of the '822

16    Patent, Claims 1, 27, and 50 of the '488 Patent.  These are

17    the asserted claims.  Plaintiffs contend that the Defendant

18    has infringed the asserted claims by making, selling, using,

19    or importing certain video games and consoles in the United

20    States, which I will refer to as the accused products.

21        The following video games, known as the Spider-Man

22    accused products, are accused products in this case:

23    Spider-Man, Uncharted 4:  A Thief's End; Uncharted:  The Lost

24    Legacy; Uncharted 3:  Drake's Deception; Uncharted:  Nathan

25    Drake Collection; the Last of Us; The Last of Us:  Remastered;

1    Ratchet and Clank; InFAMOUS First Light; Infamous Second Son;

2    Driveclub; and PlanetSide 2.

3        The parties have also agreed and stipulated that the

4    Spider-Man game is representative of all the Spider-Man

5    accused products.  That means whatever your findings may be as

6    to infringement or non-infringement as to the Spider-Man game,

7    the same result applies to the other games within the

8    Spider-Man accused products.

9        Now, the following video games, known as the God of War

10   accused products, are also accused products in this case.

11   They are God of War, Horizon Zero Dawn; Killzone:  Shadow

12   Fall; Knack, and Knack 2.

13       The parties have also agreed and stipulated that the God

14   of War game is representative of all the God of War accused

15   products.  That means whatever your findings may be as to

16   infringement or non-infringement as to the God of War game,

17   the same result applies to the other games within the God of

18   War accused products.

19       Now, Plaintiffs accuse Defendant's Spider-Man accused

20   products and God of War accused products of infringing Claim 1

21   of the '822 Patent and Claims 1 and 27 of the '488 Patent.

22       Plaintiffs also accuse the following game consoles of

23   infringing Claim 50 of the '488 Patent:  PlayStation 3 Base,

24   PlayStation 3 Slim, PlayStation 3 Super Slim, PlayStation 4

25   Base, PlayStation 4 Slim, and PlayStation 4 Pro.

1    Now, the Plaintiffs originally accused the PlayStation

2    Vita console as infringing Claim 50 of the '488 patent during

3    the trial, but based on an agreement of the parties reached

4    after you left the courtroom yesterday evening, that product,

5    the PlayStation Vita console, is no longer to be considered an

6    accused product in this case.

7    Now, the Defendant denies that it infringes any of the

8    asserted claims.  Defendant denies that it makes, uses, offers

9    for sale, sells, or imports any accused product that infringes

10   any of the asserted claims.

11   Defendant also contends that the asserted claims of the

12   asserted patents claim subject matter that is ineligible for

13   patent protection.  Patent ineligibility, ladies and

14   gentlemen, is a defense to infringement.  Defendant has the

15   burden to prove patent ineligibility by clear and convincing

16   evidence.

17   Patent eligibility and infringement are separate and

18   distinct issues, and your job is to decide whether the

19   Defendant has infringed any of the asserted claims and whether

20   those claims are patent eligible.

21   Now, before you can decide many of the issues in this

22   case, you'll need to understand the role of the patent claims.

23   The patent claims are those numbered sentences contained at

24   the end of the patent.  The claims are important because it's

25   the words of the claims that define what the claim covers and

1    what the patent covers.

2        The figures and the text in the rest of the patent

3    provide a description and/or examples of the invention and

4    they provide a context for the claims, but it is the claims

5    themselves, ladies and gentlemen, that define the breadth of

6    the patent's coverage.  Each claim is effectively treated as

7    if it were a separate patent, and each claim may cover more or

8    less than another claim.  Therefore, what a patent covers

9    depends, in turn, upon what each of its claims covers.

10       Claims may describe apparatuses or methods.  Plaintiffs

11   have asserted both apparatus claims and method claims in this

12   case.

13       Now, you will first need to understand what each claim

14   covers in order to decide whether or not there is infringement

15   of the claim.  Now, the law says it is my role as the Judge to

16   define the terms of the claims and it is your role as the jury

17   to apply my definitions to the issues that you are asked to

18   decide in this case.

19       Therefore, as I have explained to you at the beginning of

20   the case, I have already determined the meaning of the claims

21   and I have provided you with my definitions of certain claim

22   terms, and those definitions are in your juror notebooks.  You

23   must accept my definitions of these words from the claims as

24   being correct.  It's your job to take the definitions that I

25   have provided and apply them to the issues that you are

1    deciding, including the issues of infringement and patent

2    eligibility.

3        Now, for claim terms that I have not construed or

4    defined, you are to use the plain and ordinary meaning of that

5    term as it would have been understood by a person of ordinary

6    skill in the art at the time of the invention.

7        Now, several times in these instructions and throughout

8    the trial you've heard reference made to a person of ordinary

9    skill in the art or a person of ordinary skill in the field of

10   the invention.

11       In patent law, ladies and gentlemen, a previous device,

12   system, method, publication, or patent that predates the

13   claimed invention is generally called prior art.  Prior art

14   may include items that were publicly known or that have been

15   used or offered for sale, or references, such as publications

16   or patents, that disclose the claimed invention or elements of

17   the claimed invention.  Prior art may be authored or created

18   by anyone.

19       Someone with ordinary skill in the art is a hypothetical

20   person who is presumed to know all of the pertinent prior art,

21   not just what the inventor or another particular individual

22   may have actually known, in the field of the invention at the

23   time the application for the patent was filed.

24       You should disregard any evidence presented at trial that

25   contradicts or is inconsistent with the constructions and the

1    definitions that I have given you and that are in your juror

2    notebooks.  Now, for claim limitations that I have not

3    construed, that is, limitations that I have not interpreted or

4    defined, you are to use the plain and ordinary meaning of the

5    limitations as understood by one of ordinary skill in the art,

6    which is to say, in the field of the technology of the patent

7    at the time of the alleged invention.  The meaning of the

8    words of the patent claims must be the same when deciding both

9    issues of infringement and patent eligibility.

10        Now, you've been provided with copies of the asserted

11    patents, which are in your juror notebooks, and you may refer

12    to them and use them in your jury deliberations.

13        I will now explain how a claim defines what it covers.  A

14    claim sets forth in words a set of requirements.  Each claim

15    sets forth its requirements in a single sentence.  If a

16    product satisfies each of these requirements, then it is said

17    to be covered by the claim.  There can be several claims in a

18    patent, and each claim may be narrower or broader than any

19    other claim by setting forth more or fewer requirements.  The

20    coverage of a patent is assessed on a claim-by-claim basis.

21        In patent law, the requirements of a claim are often

22    referred to as the claim elements or the claim limitations.

23    When a product meets all the requirements of a claim, the

24    claim is said to cover the product, and that product is said

25    to fall within the scope of that claim.  In other words,

1    ladies and gentlemen, a claim covers a product where each of

2    the claim elements or limitations is present in that product.

3    If a product is missing even one limitation or element of a

4    claim, the product is not covered by the claim.  And if the

5    product is not covered by the claim, the product cannot

6    infringe that claim.

7        Now, the beginning portion or preamble of a claim often

8    uses the word 'comprising'.  The word 'comprising', when used

9    in the preamble, means including but not limited to or

10   containing but not limited to.  When comprising is used in the

11   preamble of a claim, if you decide that an accused product

12   includes all the elements or requirements of that claim, the

13   claim is infringed.  That is true even if the accused product

14   contains additional elements.

15       For example, a claim to a table comprising a table top,

16   legs, and glue, would be infringed by a table that includes a

17   table top, legs, and glue, even if the table also includes

18   other structures such as leaves to expand the size of the

19   table top or wheels to go on the ends of the legs.

20       Now, while I told you in my preliminary instructions that

21   there are two types of patent claims, independent claims and

22   dependent claims, I want to be clear with you that this case

23   involves only one type of patent claim:  Independent claims.

24   There are no dependent claims before you in this case.

25       An independent patent claim sets forth all the

1    requirements that must be met in order to be covered by that

2    claim.   It is not necessary to look at any other claim to

3    determine what an independent patent claim covers.

4        Now, if a person or corporation makes, uses, sells, or

5    offers for sale within the United States, or imports into the

6    United States what is covered by a patent claim without the

7    patent owner's permission, that person or corporation is said

8    to infringe the patent.

9        In reaching your decision on infringement, keep in mind,

10   ladies and gentlemen, that only the claims of a patent can be

11   infringed.   You must compare the language of the asserted

12   patent claims, as I have construed each of them for you, to

13   the accused products and determine from that comparison

14   whether or not there is infringement.   This is the only

15   correct comparison.

16       You should not compare the accused products with any

17   specific examples set out in the patent in reaching your

18   decision on infringement.   In deciding infringement, again,

19   the only correct comparison is between the accused products

20   and the elements or limitations of the asserted claims as the

21   Court has construed those claims.   You must reach your

22   decision as to each assertion of infringement based on my

23   instructions about the meaning and scope of the claims, the

24   legal requirements for infringement, and the evidence

25   presented to you by both sides, the competing parties in this

1    case.

2        I will now instruct you on the specific rules that you

3    must follow to determine whether Plaintiffs have proven that

4    Defendant has infringed one or more of the patent claims

5    involved in this case.

6        A patent can be directly infringed even if the alleged

7    direct infringer did not have knowledge of the patent and

8    without the direct infringer knowing that what it did or was

9    doing was infringement of the claim.  A patent may also be

10   directly infringed even though the accused direct infringer

11   believed in good faith that what it did was not infringement

12   of the patents.  Infringement does not require proof that a

13   party copied its product from the asserted claims.

14       Now, you must determine separately for each asserted

15   claim, whether or not there is infringement.

16       In order to prove direct infringement of a patent claim,

17   Plaintiff must show by a preponderance of the evidence that

18   the accused products include each and every limitation or

19   element of the claim.  In determining whether an accused

20   product directly infringes a patent claim in this case, you

21   must compare the accused product with each and every one of

22   the requirements or limitations of that claim to determine

23   whether the accused product contains each and every

24   requirement or limitation recited in the claim.

25       As I've told you earlier, there can be apparatus claims

1    and method claims.  Direct infringement of a method claim

2    occurs only where all the steps of a claimed method are

3    performed or are attributable to a single party.  An accused

4    product infringes an apparatus claim if it's reasonably

5    capable of satisfying the claim elements, all of the claim

6    elements, even though it may also be capable of non-infringing

7    modes of operation.

8         Now, a claim requirement is literally present if it

9    exists in an accused product just as it is described in the

10   claim language, either as I have explained or construed that

11   language for you, or if I did not explain or construe it as it

12   would have been understood by its plain and ordinary meaning

13   to one of ordinary skill in the art.  If an accused product,

14   ladies and gentlemen, omits any element recited in a claim,

15   then you must find that particular product does not literally

16   infringe that claim.

17        I'll now instruct you about the rules to follow in

18   deciding whether or not Defendant has proven that any of the

19   asserted claims of the Patents-in-Suit are ineligible for

20   patent protection.

21        To succeed on its claims for patent ineligibility,

22   Defendant must establish two things.  The first is whether or

23   not the claims are directed to an abstract idea.  That issue

24   is an issue for the Court to decide and not the jury.  I will

25   make that determination after this trial is over.  It is not

1    something that you will decide.

2         However, you, the jury, will decide the second question

3    or issue related to patent eligibility.  Specifically and in

4    that regard, the Defendant must show that the claims involved

5    nothing more than the performance of activities which a person

6    of ordinary skill in the art would have considered to be

7    well-understood, routine, and conventional at the time the

8    patent application was filed.  You, the jury, will determine

9    this issue.

10        To meet its burden on this issue, Defendant must show by

11   clear and convincing evidence that the asserted claims involve

12   only technology which a person of ordinary skill in the art

13   would have considered to be well-understood, routine, and

14   conventional, as of March the 12th, 1999.

15        The mere fact that something was known in the art at the

16   time does not necessarily mean that it was well-understood,

17   routine, and conventional.  Rather, ladies and gentlemen, the

18   test is whether, in view of all the evidence, a person of

19   ordinary skill in the art would have considered the claim to

20   involve only technology that was well-understood, routine, and

21   conventional, as of March the 12th, 1999.

22        You should consider all the evidence presented during the

23   trial, including the testimony of the witnesses as well as the

24   exhibits introduced, including the specifications contained

25   within the Patents-in-Suit.  If the evidence shows by clear

1    and convincing evidence that the elements of the asserted

2    claims, when taken individually or when taken as an ordered

3    combination, involve only technology which a person of

4    ordinary skill in the art would have considered

5    well-understood, routine, or conventional, then this element

6    of patent ineligibility have been established.

7         Now, ladies and gentlemen, with these instructions, we'll

8    proceed to hear closing arguments for the attorneys in this

9    case.

10        Mr. Buether, the Plaintiffs may now present their first

11   closing argument.

12              MR. BUETHER:  Thank you, Your Honor.

13              THE COURT:  You may proceed with your first closing

14   argument when you are ready.

15              MR. BUETHER:  I am ready, Your Honor.

16        Ladies and gentlemen of the jury, first of all, we do

17   thank you for your service and your dedication this entire

18   week, and for those of you who have been so lucky to be chosen

19   to serve on this jury, we do thank you for that.  And

20   unfortunately all good things must come to an end, and so

21   we're reaching the end of your service as a juror.

22        And when you go back home, I think the one thing you'll

23   see that's different from the week that you spent here is that

24   when you enter a room, everybody probably won't stand up for

25   you, and -- but we do that because it's out of respect for you

1    and your service, the judicial system that you are helping

2    further, and it's out of respect for your efforts here.

3        So even though people won't stand up for you when you get

4    home, that doesn't mean you shouldn't be proud of what you've

5    done here.  And so we do thank you for that.

6        Now, you heard several witnesses, seen many documents.

7    We've taken some notes about what we think has been proven and

8    read documents that remind us.  So the purpose of my closing

9    statement is to convey to you some of the things that we

10   recall that happened here that we think should guide your

11   decision, but it is up to you to decide what is important and

12   to -- what to rely on to make your decision.

13       So if I don't mention something, it's not because I don't

14   think it's important, but you can't repeat everything that

15   happened in a three-day trial in 30 or 40 minutes.  So it's up

16   to you to consider what's important, but we're going to tell

17   you a few things that we think are.

18       So at the beginning of this trial, I told you that we

19   would show you evidence that Sony has infringed the four

20   asserted patents [sic] and used Mr. Randel's patented

21   invention about shading and lighting sufficiently to meet our

22   burden of proof and to prove to you that that was done.  And

23   we believe we've done that, ladies and gentlemen.

24       You'll recall -- there we go.  The providing -- one of

25   the elements -- you've heard a lot of this, so I'm going to

1    jump right into the specifics.  But one of the elements of

2    Claim 1 of the '822 Patent and other claims was providing

3    observer data, which the Court has defined as data

4    representing at least the color of objects in a simulated

5    multi-dimensional scene as viewed from the observer's

6    perspective.

7        There we go.

8        And so there's the claim language and there is the

9    construction, providing means making available.  And so

10   observer data is at least the color of objects.  And we've

11   shown you that Sony provides color data, depth data, and some

12   other observer data, but color and depth are what are most

13   important in this trial.  And we believe it's clear that color

14   and depth data is at least color data.  It's at least the

15   color of objects.  So that element has been satisfied.

16       I'm hitting the wrong button.  I'm sorry.  Okay.  There

17   we go.

18       And we submitted -- you saw the slides of the source code

19   that Doctor Hart had reviewed, and he went through that source

20   code painstakingly for each game to show where the color data

21   and the depth data was in the -- in the code for these games,

22   and that Sony did practice that step, that part of the step of

23   observer data, providing observer data, to constitute

24   infringement.

25       Now, the second element of that patent, the Claim 1 of

1    the '822 Patent, is providing lighting data, which the Court

2    has provided a claim construction for the term 'light image

3    data'.

4        And so we showed you at the beginning of the trial that

5    we would prove that Sony and its accused games provide this

6    lighting data, and according to the Court's construction and,

7    again, Mr. -- Doctor Hart submitted substantial evidence of

8    analyzing the code for both games and showing exactly where

9    the -- that's the wrong one; I have that out of order -- the

10   light image data was located.

11       You'll recall his slides and, more importantly, his

12   testimony about what those slides showed, and those slides

13   were depicting Sony's source code for these two games, and he

14   was telling you and showing you exactly where in that source

15   code light image data was provided by Sony for these two

16   games, several examples.

17       The next step is comparing which is comparing -- rather,

18   I'll say it's comparing or storing, so it's a very long claim,

19   but bottom line, you have to compare at least a portion of

20   said observer data with at least a portion of said lighting

21   data.  So you don't have to take all of the observer data,

22   which is at least color data, or all of the lighting data to

23   make this determination.  You only have to take a portion of

24   it.

25       And so we told you we would prove that lighting data and

1    depth data were compared, and color data is included in

2    that -- rather, depth data is included in the material that is

3    compared.  And since color data and depth data are the

4    observer data, it is at least the color of objects.  So

5    although depth data was used here, depth data is part of the

6    information provided by Sony to the computer, and so you have

7    color and depth data which qualifies as at least the color of

8    objects.

9        And, once again, Doctor Hart went through the source code

10   in a painstaking manner and showed and explained exactly how

11   the Sony games stored in a light accumulation buffer the

12   compared data to determine a model point.  And you can see, if

13   you recall, he went through all this very complicated code and

14   was able to explain how these elements were present in that

15   code.

16       The last step of Claim 1 -- or not the last step, but the

17   last active step is combining, and it says combining at least

18   a portion of said light accumulation buffer data with said

19   observer data.  And so what do the Sony products do?  Doctor

20   Hart explained:  They combine color data with a portion of the

21   data in the light accumulation buffer.  Color data is, of

22   course, at least the color of objects, and so that proves that

23   element.  And, again, Doctor Hart went through the source code

24   very carefully and pointed out in several occasions where that

25   data was combined.

1    And so Sony challenges this step.  They say, Oh, no, we

2    don't do that.  But they challenge it on a completely improper

3    basis.  And you'll recall they talked about two challenges to

4    the Plaintiffs' case, and the combining step is their second

5    challenge.  And I'll discuss that one first.  And Doctor

6    Lastra, you'll recall, said that only after all light falling

7    on a region is stored can you combine that data with observer

8    data.  And as you'll also recall -- this is where he made that

9    assertion.

10    But as you also will recall, Doctor Lastra misrepresented

11    the requirement here, the claim language that was required.

12    He said all and -- and, as he admitted, he was wrong about

13    that.  He had made up the language that he was using to

14    analyze the claims and the products.  And so he admitted that

15    that analysis was flawed.  And so for that reason alone, you

16    should disregard what he had to say about a non-existent claim

17    limitation.

18    But beyond his error in applying the wrong standard and

19    the wrong claim language, we submitted substantial evidence

20    showing how the comparing step and the storing step was used

21    or was implemented before the combining step was performed.

22    As you'll also recall, Doctor Lastra acknowledged that the

23    fact that Sony may do things out of order on one occasion

24    doesn't negate the fact that they practiced the step in other

25    occasions.

1    So the fact -- the question is, did they do it and not

2    did they do it all the time or forever.  And the evidence

3    shows that they did do it.  And Doctor Lastra applied his own

4    improper test to come up with an opinion that Sony didn't do

5    it, but because he applied -- he didn't apply the claim

6    language as construed by the Court, that analysis is

7    inapplicable and should be disregarded.

8    And here's where I asked him.  So based on your

9    understanding of what comprising means -- oh, this is a

10   separate point.  I'm sorry.  You heard the Judge's instruction

11   on comprising, and so that means that if Sony's accused

12   products do other things in addition to what the claim

13   requires there for combining, that doesn't matter.  Comprising

14   allows other additional non-claimed steps to be performed, and

15   that doesn't change the fact that Sony infringes.  So keep

16   that in mind.  The fact that Sony may do another thing here

17   and another thing there doesn't take away from the fact that

18   they did what the claim requires.  And once you satisfy those

19   ingredients, anything else you're doing doesn't matter because

20   you've infringed once you've done what the claim requires, and

21   you can do a hundred thousand other things, it doesn't change

22   that fact.

23   And this goes to the same point that -- that the fact

24   that you don't practice the steps in the proper order in one

25   occasion doesn't change the fact that you did in other

1    occasions, so that doesn't relieve you of your infringement.

2        See, here is where he said -- here is where he said, "So

3    if Sony games on a separate occasion from the instance that

4    Doctor Hart talked about did the steps in the wrong order,

5    that wouldn't change the fact that it did the steps in the

6    right order in another occasion."

7        He said, "That's right.  If it had done the steps in the

8    right order."

9        So that's without dispute in this case.

10       Now, the other argument that Sony has made here is it

11   argues that there is a requirement that the light be stored in

12   the accumulation buffer from the light source's perspective

13   for a cumulative light falling on a region.  And the problem

14   with that construction is, Doctor Lastra had to concede, is

15   that is really a combination of two different claim elements.

16       So, once again, Doctor Lastra didn't follow the claim

17   language and didn't follow the Court's interpretation of that

18   claim language, but made up his own claim element and then

19   said that Sony didn't infringe that element.  Well, that's

20   totally improper.  Once again, it's a flawed analysis.

21       And so, for example, here, he took those two light

22   accumulation buffer and light image data constructions and

23   blended them together.  Totally improper.  As you can see

24   here, the light image data is from one step and the light

25   accumulation buffer is from another step, and they're

1    separately defined.  It's improper to merge the two.  They are

2    not -- they are separate steps.

3        And so here is where Doctor Lastra admitted that that's a

4    false or flawed analysis.  And he agreed essentially that what

5    he did was flawed and, therefore, wrong.  You can't blend

6    those claim constructions like he did.

7        Okay.  Now we get to one aspect of Doctor Lastra's

8    blended claim, and that is the light falling on a region.  And

9    you'll recall when Mr. Hastings was up here, he admitted that

10   the physically-based rendering model of rendering that the

11   Sony games that are accused use, that they evaluate the light

12   that's falling on a material or a region.

13       He said -- I asked him, "The light falling on a material

14   is equivalent to the light falling on a region of the pixels

15   that are depicting that material.

16       "Yes."

17       And then he admitted that they do that.  It's part of

18   their physical-based rendering model.  And Mr. Hobson agreed

19   with that for the God of War.  And so even if you look at

20   Doctor Lastra's flawed analysis, the evidence shows that the

21   Sony games do evaluate and process light falling on a region.

22       And this slide from Mr. Hastings' testimony confirmed

23   that, because here you had a light source over on the left

24   hitting the ground, falling on the ground, and then there is

25   light reflecting from that light falling on the ground back up

1   to the observer.  You can't have the reflection without the

2   light falling on the ground first.  Doctor -- rather Mr.

3   Hastings conceded that point.

4       And so the light that's being observed by the observer

5   originated from, came from, and that's one of the things they

6   want to look at, the light over here that was falling on the

7   region of the ground.

8       And so there's no question that Sony's games do this.

9   And so Doctor Lastra's analysis, beginning with a flawed claim

10  interpretation, also ignored this evidence where it clearly is

11  light falling on the ground and then being reflected and

12  observed by the observer.  And so that argument is no good.

13      And here, yeah.  "Okay.  Is it correct, Mr. Hastings,

14  that the only light that is viewed from the observer's

15  perspective on these slides is reflected light?

16      "Yes."

17      And that the specification -- this is Docket

18  Lastra -- before I get to that.  And so, once again, without

19  light falling on the ground, there's no reflection from it

20  somewhere else.  And so to say it doesn't -- that the Sony

21  games don't evaluate that light falling on the ground is

22  ignoring half of reality.  And so for that reason, Doctor

23  Lastra's opinion that there's no satisfaction of the light

24  image data being provided or the storing element being

25  provided on this ground is without basis.

1        Now, Doctor Lastra tried to -- it's -- his argument was

2   that you only -- that if they didn't evaluate the light

3   falling on the ground on the region from the light source,

4   well, then they didn't infringe and he tried to justify that

5   analysis by pointing to some pseudo code in the patent that he

6   claimed showed that it's the perspective of the light source

7   has to be done and they didn't do that.  Their games use the

8   perspective of the observer.  So he said that's why we don't

9   infringe.

10       But -- and here he was asked by Mr. Buresh about the

11  pseudo code, and he said that's a good thing to look at

12  because it tells you that there is a distinction.  Well, it

13  turns out that Doctor Lastra's analysis of that pseudo code is

14  a hundred percent wrong.  This is the pseudo code that he

15  looked at, and it's a bit complex, but he was looking down

16  here at the accumulation SPx SPy plus y equals light image,

17  but he completely ignored the statement above where it says

18  for each pixel in camera image SPx and SPy.

19       So what the patent was teaching is not that you require

20  looking at the light source or looking at the light data from

21  the light source's perspective; you look at it from the camera

22  image.  It starts up there at the light source, but it ends up

23  and is counted or accumulated from the observer's perspective.

24  So Doctor Lastra had this wrong as well.

25       Yeah, this little snippet, it looks like it's a

1    little -- it only has the question.  I'm sorry.  Could we --

2    this is where -- I'll tell you what.  This is where Doctor

3    Hart -- I asked him, is this like one second out of the whole

4    game that you cherry-picked to show the jury and claim that

5    the game infringes?  And he confirmed, no, he found this code

6    in each of these cases, the providing observer data, providing

7    light data, comparing, storing, and combining, he found that

8    code all over the place, but, you know, it wouldn't be

9    worthwhile for him to show every instance.  And guess what?

10   His statement was never challenged by Sony.  They never

11   questioned his saying that there were many, many, many

12   instances of this happening.  So I don't want you to go away

13   and think that that was the only occasion where Sony did this.

14   Once is enough, but they did it throughout the game.  So I

15   wanted to confirm that.

16        Lastly, there's a displaying step which comes last, and

17   that was shown satisfied because Sony tests and demonstrates

18   the accused video games.  So they hook up the system so that

19   the lighting and shadowing information that's being provided

20   and accumulated is shown when they test the games internally

21   to see if they have bugs or not.  And when they demonstrate

22   the games to the public, they certainly have to display the

23   game after it performs all of those steps.  And so it's clear

24   that Claim 1 is infringed.

25        Now, you also heard that -- from a witness that, oh, that

1    code that you see there, we really don't use it, which was a

2    bit unusual, but they claim that. But then you heard Mr.

3    Hastings admit they have -- they claimed that they have

4    documents that would prove that. Oh, but they didn't show you

5    any. So, trust me, we don't infringe. Even though our code

6    says we do, pretend it doesn't exist because we really don't

7    use that stuff. Yet they didn't show you any evidence that

8    they don't use that. So I would think the jury -- you should

9    disregard that unsupported claim by them that they don't use

10   that.

11       Plus, as you heard from Doctor Hart, that's not the only

12   occasion on which they performed those steps. And so that's

13   not an excuse. They shouldn't avoid responsibility for what

14   they've done by making an unsubstantiated claim that that

15   piece of code that Doctor Hart pointed to, oh, we don't do

16   that. It's just there for kicks and giggles.

17       So the '822 claim 1 has been met. All of the elements

18   have been -- the steps have been performed, and that

19   constitutes infringement.

20       And then, of course, Claim 1 of the '488 is virtually

21   identical except for the last step. So four or five of those

22   steps have also been performed.

23       And with regard to the last element or step, it says

24   outputting resulting image data. Well, it's not exactly the

25   same as displaying. But when Sony tests and demonstrates its

1  games, it is outputting the resulting image data, in this

2  case -- or in that case if it's a demonstration to the -- to

3  the computer that's showing it to the -- to the event that's

4  come to watch it or internally when they are testing it to the

5  testers so they could see how the game is actually operating.

6  So the outputting step has been satisfied.  That means Sony

7  infringes Claim 1 of the '488 Patent.

8      Now, then you come to Claim 27, which has a preamble that

9  is different from the method claims that were in the '822

10  Claim 1 and the '488 Claim 1.  So this is an apparatus claim,

11  not a method, and so it's about what the thing is as opposed

12  to using it and performing it.

13      And Doctor Hart explained that both Spider-Man and God of

14  War, they are available on disks as well as digital downloads.

15  Those are computer-readable mediums, and those games carry the

16  source code or the software based on the source code that

17  carry the instructions, and they're configured to cause a

18  processor in whatever is displaying this game to perform that

19  method, to use that method.

20      And so clearly Claim 27 is infringed because they supply

21  the disks and the digital downloads to perform the method.

22  And so that's why the '488 Claim 27 is infringed by Sony.

23      Then you've got the platforms.  A bit of a different

24  claim because this is also an apparatus claim that concerns a

25  computer circuit for processing computer graphics, coupled to

1    a computer system to operatively render simulated shadows in a

2    multidimensional simulated scene by performing steps

3    comprising, and those steps are very similar to the steps

4    you've already seen and heard about.  But it's a little

5    different so it deserves its own treatment.

6         But before you do that, you must look at the Court's

7    construction.  And so it construes the preamble as limiting,

8    and it's a computer circuit actually programmed or equipped

9    with hardware or software for processing the computer graphics

10   data that is coupled to a computer system to operatively

11   render the simulated shadows by performing those steps

12   comprising.

13        Again, it can include more, but if it includes this, that

14   is good enough for infringement.  But, most importantly, the

15   Court construed that the data that was being received by the

16   device, the PlayStation, in this claim and limitations

17   observer data and lighting data, did not have to be in the

18   computer.  It does not require that.  They could be supplied

19   by the game.  And so Doctor Hart went through the circuit in

20   the devices, the PlayStation devices, and showed where the

21   computer circuit is, where the computer system is that it's

22   connected to or coupled to.  It showed the GPUs that were used

23   by the box to process the data that's needed to perform the

24   steps and then display the result.

25              THE COURT:  Mr. Buether, you've used 25 minutes you

1    have eight minutes in advance of having used 33 minutes.

2         MR. BUETHER:  Thank you, Your Honor.

3         And so, once again, the detailed analysis by Doctor Hart

4    of the circuitry and hardware in the platforms shows that all

5    of the elements of the preamble are met.  I believe you'll

6    recall that.

7         And then it also shows that the comparing step, because A

8    and B don't have to be in the device, but he showed in the

9    games where those -- that data was.  But in subset (c), he

10   showed where that is performed, that Sony's API converts the

11   information to satisfy that.  This is where in the circuitry

12   the storing occurs.  He showed and explained that.  He showed

13   where the combining is.  And then we go to transmitting.  He

14   showed how the data is then transmitted outside the computer

15   to be displayed on a display device.

16        Once again, Doctor Lastra used his light image data

17   excuse by saying, oh, it doesn't use -- it uses the

18   perspective of the light source, not the observer, but we've

19   already shown how that's not a valid analysis for several

20   reasons.

21        And then he tried again the combining argument which is

22   based upon the totally flawed analysis of a claim term that

23   didn't even exist, that he made up.

24        And so for that reason, you'll see that all four claims

25   that have been asserted, we've submitted the proof that shows

1    that Sony infringed those patents and infringed those claims

2    of those patents.

3        Again, we've taken out the Vita product it's not at

4    issue.

5        And we've also shown you through the deposition testimony

6    you've heard and other evidence that Sony made and sold the

7    accused video games in the United States.  They tested and

8    demonstrated the accused video games.  They imported these

9    games, and then they also sold the -- rather, the consoles,

10   and they also sold those consoles in the United States.  So

11   Sony clearly has infringed these claims of the patent.

12       I've already talked about Mr. Hastings' testimony, so

13   let's skip that.

14       Now I want to point your attention to what I call Sony's

15   red herrings.  You heard a lot of argument about things or

16   evidence about things that don't even matter.  Doctor Lastra

17   admitted that all the side issues about TRI being a good

18   business partner or Infernal -- the fact that Infernal is a

19   party in this case as an exclusive licensee or that TRI has

20   not used the invention for a period, all of --

21            THE COURT:  Mr. Buether, you've used 28 minutes.

22   You're five minutes in advance of using 33 minutes.

23            MR. BUETHER:  Thank you, Your Honor.

24       Whether the patents expired is completely irrelevant.

25   The press article that gave a low rating to Nocturne, totally

1    irrelevant to the issues that you have to decide.  And so

2    please ignore them.

3        For example, TRI not using the invention?  You heard from

4    Mr. Hastings and Mr. Hobson that with the advent of consoles

5    for a long period of time they didn't have the horsepower to

6    perform these kinds of operations.  They couldn't do it until

7    2013.  It's not that Sony couldn't handle coming up with a

8    method for rendering graphics.  It's that they didn't have the

9    tools.  They were not based on PC use.  They were based on the

10   consoles which simply didn't perform adequately to perform

11   these methods.

12       And that's why, unfortunately for Mr. Randel, he had

13   developed this great invention that worked extremely well, but

14   just as he did that, the ground shifted from PC use to console

15   use, and the console simply couldn't do it.

16       So there's -- oh, so let's talk about the well

17   understood, routine, and conventional issue.  You'll recall

18   Doctor Lastra admitted there is a presumption of validity.

19   You heard from the Judge that they have to prove this issue by

20   clear and convincing evidence.  And I submit all you heard

21   from Doctor Lastra was totally conclusory opinions.  He didn't

22   cite a single document that supported his opinions that this

23   was well-understood, routine, and conventional.

24       And I submit, if something has been well-understood,

25   routine, and conventional since 1999, I'm sure somebody would

1    have written something about it and Sony would have found it

2    and shown it to you.  But they didn't because they didn't have

3    it.  And remember that Sony has stipulated that it is not

4    challenging the invalidity of Mr. Randel's patents; only the

5    patent ineligibility.  And that requires a showing that the

6    invention at the time was well-understood, routine, and

7    conventional, and they didn't do that.

8         And, finally, if you heard Doctor Lastra's testimony, he

9    didn't really address the true nature of this invention, which

10   was converting 3D polygons to 2D pixels before you implemented

11   his invention because that made it work faster and smoother

12   and also that you avoided the double darkening problem, double

13   shadowing, by finding what's illuminated versus finding out

14   what's shadowed.  So I submit that Sony didn't come close to

15   satisfying their burden of showing that his invention in 1999

16   was well-understood, routine, and conventional.

17        Oh, that's right.  This is not -- and you'll remember

18   that Doctor Hart came back on rebuttal after listening to all

19   of this evidence and swore under oath that none of that

20   changed his opinion and he still adhered to his belief that

21   the accused games and consoles did infringe the claims of the

22   patents that have been asserted.  And we ask you to hold Sony

23   accountable and find that they have infringed these claims

24   because that's what they did.

25        Thank you very much.

1          THE COURT:  Defendant may now present its closing

2     argument.

3          Proceed when you're ready, Mr. Buresh.

4          MR. BURESH:  Thank you, Your Honor.

5          When I was growing up, there was a donut shop in town.

6     We were kind of on the outskirts, but one of the things my dad

7     let me do on Saturday mornings was ride my bike into town.  It

8     was Dad's Daylight Donut Shop.  Have you heard of those old

9     ones that used to be around?  And when I'd go there on

10    Saturday morning, there was a group of old country lawyers

11    that would gather in there and drink their coffee on Saturday

12    morning.

13         And as they started seeing me every, you know, couple of

14    weeks or whatever, they would draw me into their

15    conversations.  And it was an amazing experience for me.  I

16    would sit down and eat my donuts and listen to them as they're

17    drinking their coffee, and they would talk about their war

18    stories of the trials they had in their little county

19    courthouses over the week.  And, you know, we started to

20    become -- I don't know what they'd call it, I would call it

21    friends looking back.

22         As I got older -- I was probably 9 at that point.  But as

23    I got to 12, 13, they started inviting me to go to court with

24    them and watch what they were doing, like during the

25    summertime I'd go watch a case with them and they'd tell me

1    what they were doing.  And then sometimes on Friday nights,

2    they'd come and watch me at the American Legion Field.  We'd

3    play a baseball game.  They'd come watch that.  We were -- we

4    were friends.

5        Now, those gentlemen are all passed away, but they left a

6    mark on me.  As I was a little kid, I kind of worshipped them.

7    Not in a bad way, but they were amazing.  They had their names

8    on buildings in town, and I thought they were -- they were

9    super.  But they left a mark on me.

10       And one of the things that they taught me from that young

11   age as I was starting to learn about the law through them was

12   that this room that we're in now, it's a sacred room.  You

13   know, one of them would -- used to tell me, he would say, it's

14   not quite as sacred as the altar in our church, but it's

15   pretty close.  It's a -- it's a sacred room.  And the reason

16   it's a sacred room is because this is where justice is done.

17   And you're part of that process.

18       You don't bring stuff in here like it's some kind of

19   game.  You don't, you know, make stuff up as you go along.

20   You come here to tell the truth and to have justice done.

21   This is a sacred room.

22       Another of the things that they taught me was the beauty

23   of the jury system.  They taught me to love the jury system.

24   Now, a lot of folks are -- even in my profession, they're

25   scared of juries.  They say, whoa, you know, I want to be in

1    control.  I'm a control freak.  So I don't want to give

2    control over to a group of eight people that I just met and I

3    don't know beyond some information on a page and a few

4    questions.  It's scary for folks.

5         But it's not scary for me because, again, I was brought

6    up from a young age to see that juries operate with

7    the -- just in a way that's hard to describe.

8         But the Court -- there's -- I said this in my opening and

9    the Court read instructions to you and will provide these

10   instructions to you when you're back in your jury room.  But

11   if you look at page 5 of those instructions, there's a whole

12   paragraph in there talking about your common sense, which I

13   talked to you about in the beginning.  Your life experiences

14   that you bring to this.

15        And as I said earlier in the case, as you all get

16   together and have the opportunity to do what we call

17   deliberate, that common sense just comes together and becomes

18   a powerful force for finding the truth, the truth that

19   supports justice.  Okay?

20        And another instruction from the Court that will be with

21   you in the jury room, it's on page 2, there's a whole

22   paragraph here talking about the importance of the credibility

23   of witnesses.  That just means their honesty.  Do you think

24   they were telling the truth?  Is what they're selling you a

25   bill of goods or is it meaningful?  Is it something you want

1    to weigh as evidence?  There's a whole paragraph here telling

2    you how to do that.  That's an application of common sense to

3    judge the credibility of witnesses.

4         And I've seen it happen over and over again, and I trust

5    the system.  I think it's a wise system.  It's been around, as

6    His Honor said, since the time of Moses and the Israelites.

7    It's been around a long time and it works.  Okay?

8         So as we came here a few days ago, the scales of justice

9    were perfectly even.  You remember that?  Nobody had given any

10   evidence yesterday.  It was ground zero.  Everything was

11   perfectly even.

12        Now you've heard the evidence.  Okay?  And it's your job

13   applying that common sense and applying a judgment of

14   credibility to start to take the evidence you've heard and

15   place it on a scale.  Is it going to go on Plaintiffs' scale?

16   Is it going to go on Sony's scale?  That's what you're going

17   to be doing while you deliberate to see who has more credible

18   evidence.  Okay?

19        So I want to start out by just looking at the witnesses

20   we've walked through.  I'm going to go through each one that

21   you heard from.  Okay?  I want to start on the Sony side

22   first.

23        You heard from Mr. Hastings who's been with us here for

24   the entire time and Mr. Hobson who joined us yesterday.  Those

25   gentlemen came in and they told you the truth.  They didn't

1    equivocate, they didn't dodge questions, they didn't evade

2    even on cross-examination when Mr. Buether was asking them

3    questions.  When they received a direct answer that they

4    understood, they -- I'm sorry, a direct question that they

5    understood, they gave a direct answer.  No games.

6        You heard from Doctor Lastra, who's still sitting with us

7    in the back of the courtroom.  He testified as well.  And when

8    he received direct questions that he could understand, he

9    provided direct answers.  He did not evade.  He did not play

10   games.  He just testified question and answer.  It was fair.

11   He testified truthfully.

12       Now, Mr. Buether -- I want to talk about his accusations

13   against Doctor Lastra.  He has basically told you that Doctor

14   Lastra contradicted the Court's claim constructions.  He just

15   said it again standing right here.  He said that Doctor Lastra

16   admitted that his analysis was flawed, and he showed you that

17   testimony on a slide that was up on your screen for all of 10

18   seconds with a full paragraph of question and answer there.

19   He showed it to you for 10 seconds.  Because what Doctor

20   Lastra actually said was, if I had applied the wrong claim

21   construction, then my analysis would be flawed.  Okay?

22       Now, as the day progressed yesterday and Doctor Hart came

23   up on a rebuttal case, you actually got to see an instance of

24   an expert who was, without question, offering you testimony

25   that contradicted the Court's constructions.  Without

1    question, he did that.

2         The Court's constructions are the rules of the road.

3    They are binding on us, they are binding on Plaintiffs, and

4    they are binding on you.  It's not even a question for you.

5    You just apply the Court's constructions that are going to be

6    in your jury binder.  It's not a question for you.

7         But I'm telling you, when an expert -- if Doctor Lastra

8    had attempted to offer evidence that was contrary to the

9    Court's constructions, you can't do that.  Okay?  That tells

10   you all you need to know about the accuracy of his testimony.

11        But let me walk through it.  Okay?  We've seen this.  I

12   want you to see it again.

13        As we proceeded through this case, there were three key

14   questions--what was being accumulated, what kind of light.

15   Now, Mr. Hastings, Mr. Hobson, Doctor Lastra, all

16   unequivocally said Sony never accumulates light falling on a

17   region.  And you heard from Mr. Hastings and Mr. Hobson not

18   only that they don't but why they don't, that it would mess up

19   their games, that their graphics wouldn't look good if they

20   did it the way Mr. Randel did it.  Okay?

21        From which perspective the light sources.  It has to be

22   accumulated from the light source's perspective.  That's the

23   can light looking down.  They say, we never accumulate that.

24   Each one of these witnesses--never do that.  Because we want

25   to know what's hitting your eyes.  We don't care what's

1    falling on the surface.  Okay?

2        And only at the end.  You can't use observer data until

3    you've accumulated all your light.  That's the -- that's the

4    join-it together step.  Right?  The join-it together, and then

5    you can use your observer data in Mr. Randel's method.

6        Sony can't do that.  They have to use observer data at

7    every step in order to figure out what your perspectives are.

8    Remember Juror No. 1 has a different perspective than Juror

9    No. 4?  Remember that?  Okay.  You have to use observer data

10   to figure that out.

11       So Doctor Lastra, he did what a professor does.  He did

12   what an expert does.  Okay?  He's trying to educate.  He's

13   trying to assist you in your understanding.  So what Doctor

14   Lastra provides here is an easy, as close to plain English as

15   you can, explanation of what's required by Mr. Randel's

16   claims.

17       I want you to judge for yourselves, does this align with

18   the claim constructions.  Okay?  So look at these words that

19   I've underlined, kind of put them in your memory banks.  Light

20   source's perspectives and cumulative light falling on a

21   region.  Okay?

22       Now I'm going to go to the next screen which is the

23   Court's claim constructions.  You see here down with me in the

24   claim language that storing limitation?  Storing light image

25   data.  So we go up and we look at what light image data is.

1    It's light emitted as viewed from the light source's

2    perspective.  It's the same words, exactly same words.

3        Now we've got to store that light--go back to the claim

4    with me--in the light accumulation buffer.  Do you see that?

5    Now look with me at the Court's definition of light

6    accumulation buffer.  The Court has said that you need to

7    store light image data, that's this one, for the cumulative

8    light falling on a region.  Same words that Doctor Lastra

9    provided you, same exact words.

10        Now, Mr. Buether goes, well, Doctor Lastra, he's merged

11    them.  He's merged these requirements and, therefore, his

12    testimony is invalid, you should scrap the whole thing.

13        If we look at the light accumulation buffer, what's it

14    say?  It is memory for storing the light image data.  The

15    Court's construction treats them as merged.  Okay?

16        Let's go to the next screen and see if I can take off my

17    smiley face.

18        The second step.  After the first step, we've stored all

19    the light falling on the region, and, yes, I'm going to call

20    it clumping.  I'm not backing down from that.  If you take 10

21    baseballs, duct tape them together into a beach ball, you've

22    got a clump.  If you take 10 light sources that are falling on

23    this spot right here and you clump them together, you've got a

24    clump.

25        Now, here's a secret.  I'm not a computer scientist.  I

1   have no degrees in computer science or any of this stuff.

2   Neither do you guys.  Neither does Mr. Buether.  Doctor Lastra

3   does.  Okay?  He's got degrees.  And what he's trying to do,

4   again, is to explain these in words you can understand.  All

5   right?

6        Now, if we look at this next requirement, the only after,

7   Mr. Buether, again, he's made a big deal about this, the words

8   only after don't appear in the claims.  They don't appear in

9   the Court's claim constructions.  Well, no kidding.  It

10  wouldn't be making it more understandable if we used the exact

11  same words.  But test this.  Is only after in the Court's

12  claim construction?  Okay?

13       Here's the Court's claim construction.  I want to draw

14  you real quick to this piece of the claim, for each of said

15  plurality of light sources.  See that?  And then we have our

16  storing limitation.  Okay?  So we store in Mr. Randel's method

17  for each light source, that's the accumulation.  Lights 1

18  through 10, we clump them together.  That's this step, the

19  storing step.  And then.  See that?  So after we've clumped it

20  all together, and then we combine.  Okay?

21       But the Court didn't want there to be any ambiguity as to

22  this order, you know, just leave it to and then because we

23  would hear a bunch of arguments about what and then means.  So

24  the Court comes and says, I'm going to give a construction for

25  this order requirement.  And the Court's construction is that

1    the comparing--that's this one--and the storing--that's this

2    one--for each light source are completed--come back up here

3    now--they are completed before beginning the combining step.

4        Now, plain English, if comparing and storing are

5    completed before beginning combining, that is exactly the same

6    thing as saying that you can combine only after you've

7    completed comparing and storing.  That's plain English.

8        Let's get out of the technology context, and I'll harken

9    back to -- well let's do baseball again.  Okay?  Got innings

10   in baseball, and I think, you know, unless there's extra

11   innings, major leagues at least, you go 1 through 9.  Right?

12       So let's say that the rule of baseball is that the first

13   inning needs to be completed before beginning the second

14   inning.  Does that make sense?  That means I can't do two outs

15   of the first inning and then go jump ahead and do an out of

16   the second inning and then come back and finish up a third out

17   of the first inning.  I have to do them in order.

18       Another way of saying that is, I get to the second

19   inning, I can begin the second inning only after I've

20   completed the first inning.

21       Doctor Lastra's language is more simple, it's more

22   understandable, but it's precisely in keeping with the Court's

23   construction, which is why he offered those opinions.

24       Mr. Buether also challenges the 'all'.  Does it have to

25   be all of the light falling on a region?  Well, that's not in

1    the claim language, it's not in the Court's constructions, but

2    is it really there?  Let's look at that.

3        Again, we're talking here about the storing limitation

4    primarily and also the comparing limitation.  You have to do

5    that for each light source, and then begin your combining.

6    Okay?  So for each light source, I have to do this.  That's

7    all of them.  Each is all where I come from.  I think that's

8    consistent here.  Each is still all?

9        So now we ask the question, when the Court's construction

10   says the comparing and storing steps, that's referring to

11   these that include each light source.  That's all of them.  So

12   when we do the comparing and storing steps, is that all of it?

13   Of course it is.  That's what the claim language tells us, and

14   common sense tells us that, too.

15       When I was in -- this is 16 now.  I'm taking a trip down

16   memory lane with you guys.  When I was 16, I worked at this

17   farm and feed store.  Do you-all know what that is?  You get

18   your dog food, get your horse food, get your fences, get

19   gates, whatever you need to run on your farm.

20       And during the day, as I was there, I was, you know, what

21   I'd call a peon.  Right?  The owner, who also worked in this

22   small -- it was a small shop, but he would have a customer

23   come in, they'd order 20 bags of feed, and he'd say, the boy

24   will help you.  Okay?  Load it into your car, load it into

25   your truck.  I was the boy.  I was loading the feed.  I was

1    wrangling fences into the back of pickup trucks, sweeping,

2    whatever.

3         But at the end of the day, the owner would come up to me

4    and he would say almost always the same words, but he would

5    call me Mr. Buresh.  I was, like, what's going on?  He's kind

6    of a stern man.  He says, "Mr. Buresh."  It got my attention.

7         He says, "I need you to go up to the cashier and get the

8    receipts."  That's the money that's come in for the day.  "You

9    need to take the receipts and deposit them in the bank on your

10   way home."  He was calling me Mr. Buresh because it was a

11   serious deal and he wanted me to take it and do it like a man

12   responsibly.  Okay?  And I did.  You know, I was very diligent

13   about getting it to the bank prompt, I went straight there, I

14   went to the deposit window, and I made the deposit.

15        Now, what if, instead of doing that, I went up to the

16   deposit window, and I said, there's probably $500 in this bag.

17   I could use 50 of it for the weekend.  And, by the way, the

18   store owner, he only said deposit the money.  He didn't say

19   all the money.  He just said, the money.

20        Now, if I took 50 bucks out of that bag because the owner

21   said the money instead of all money, I'd be stealing from him.

22   Right?  Because when you say deposit the money, you mean all

23   of it.  That's plain English.  It's common sense.

24        And it's in the claim language.  Doctor Lastra's analysis

25   that he provided, precisely correct.

1    So that's the Sony witnesses, one after another:  We

2    don't do it.  We don't use Mr. Randel's method.

3    Mr. Hastings, as we heard from Mr. Buether this morning,

4    he admitted, Mr. Hastings did, he admitted that Sony evaluates

5    the light falling on a surface.  I mean, you might want to

6    write that down.  We could pack up our bags and go home.

7    We've admitted infringement according to Mr. Buether.

8    Or possibly it's what we call a straw man.  Are you

9    familiar with that concept?  A straw man in my profession,

10    it's -- it actually didn't come from my profession.  This is,

11    as far as I know, tracks back to the Old West days when they'd

12    have the miracle oil guys, the snake oil salesmen that would

13    go around in their wagons and try to persuade people to buy

14    oil that had no use whatsoever.  And a lot of times the town

15    folks would get upset, and somebody would challenge him, like,

16    this stuff isn't working, it's not doing anything.

17    So the salesman with his big personality would pick

18    somebody and go after them to try to get the support of the

19    townspeople.  A tactic that he would use is called the straw

20    man tactic.  And that is this, like, if I'm in an argument

21    with somebody, I don't know, just whatever argument we're

22    talking about, and I look at them and people are listening to

23    the argument, okay, and I say, now, sir, you would agree with

24    me that the sun rises in the east, doesn't it?

25    He goes, well, of course it does.

1      That's it.  You all heard it.  He agreed with me.  We're

2   done.  I win.

3      That's a straw man.  The basic premise is it's a fact

4   that has nothing to do with anything, it doesn't matter for a

5   hill of beans, everybody agrees to it, and the straw man

6   tactic is to take that nothing fact and turn it into a win.

7   Okay?  That's the game.

8      Now, here's the thing.  Do we evaluate light falling on

9   the surface?  Of course we do.  How else would we ever be able

10  to find your perspective and your perspective?  The question

11  is not whether we evaluate light that hits the surface.  The

12  question is whether we accumulate it.  And we never accumulate

13  light falling on a surface.  We don't care about that.  It's a

14  step in the calculation.

15     You remember my opening where I stood here over my right

16  shoulder with this can light and said, we've got to know where

17  the light's coming from so we can figure out where the light's

18  going to.  Remember that?  We have to evaluate the light

19  source falling on the surface so we can figure out where it's

20  going to.

21     Now, I'm plainly not the best lawyer in the world.  I'm

22  not even probably among the category of good ones.  There's

23  lots better.  But I would say this.  I don't admit

24  infringement in an opening statement.  I'm confident I didn't

25  do that.  And so when we all admit, when Mr. Hastings admits,

1    when I admit, when Doctor Lastra admits that Sony looks at the

2    light falling on the surface as part of its calculation, that

3    doesn't have anything more to do with this case than the fact

4    that the sunrises in the east.  It's just a fact that

5    everybody agrees to.

6        Now, I want to look at the other side of the coin.  We

7    talked about Mr. Hastings and Mr. Hobson, Doctor Lastra.  I

8    contend that those are chunks of evidence on the side of

9    Sony's scale when you're doing your weighing.  I think their

10   testimony supplies you with credible evidence.  Okay?

11       Now let's talk about the other side of the scale.  I'm

12   going to start with Mr. Will Perry sitting right in front of

13   you here.  He testified that despite being good business

14   partners with Sony, the fact that no notice was given to Sony,

15   the fact that they, you know, when asked didn't even tell us

16   about their patents, that that's a fair way to treat a good

17   business partner.  Okay?  He came in here and he said that.

18   It's up to you.  It doesn't matter much whether it's fair or

19   not.  Here we are.  But that's his testimony.

20       Now, he also testified that what were they doing?  What

21   was Infernal games about?  Well, it's a monetization program.

22   Monetization equals a money program.  That's what Infernal

23   Technology is about.  Mr. Perry said he was an investor.

24   Okay?  It's fine.  It's fine.  But we all know that you can

25   make bad investments.  It's just part of life.  You can make

1    bad investments.

2        Mr. Perry, beyond that didn't say anything that matters

3    for a hill of beans.  Not even an ounce of evidence can be

4    placed on any scale because of his testimony.  All right?

5        We come to Mr. Randel, who's also in front of you just

6    left from Mr. Perry.  He is the inventor on these patents.

7        This doesn't happen in every case, but it happened in

8    this case.  You recall when Ms. Marriott was cross examining

9    the inventor, she asked him, "Sir, do you disagree with the

10   statement that you gave under oath in 2016?"  That was a

11   deposition a few years ago that he gave.

12       So let me set the context for this, and you've heard this

13   before but you take a deposition, you come in, just like you

14   do in court, and you raise your right hand and you swear an

15   oath to tell the truth.  Okay?  And he did.  He did that.  And

16   then he comes into court here and he raises his right hand and

17   he swears to tell the truth.  He gets on the stand, and under

18   cross examination, we say, Hey, something sounds a little bit

19   off here.  You testified back several years ago to a certain

20   fact.  You testified to it, and now you're saying something

21   different.  So back in 2016 did you say that?

22       Yes.

23       But even more so, now, instead of backtracking on the

24   stand or whatever, he just doubles down and says, "Do you

25   disagree with the statement you gave under oath in 2016?"

1    "Yes."

2        In our profession we call that impeachment.  Okay?  It's

3    when you have a witnesses that 180 degrees contradicts

4    himself.  And you-all need to ask yourselves why that happens.

5    Like in the human experience, why does somebody swear one

6    thing one time and swear another thing another.  Okay?

7        In life we oftentimes pursue goals, and if our goal is

8    monetization, if our goal is money, we get focused on that

9    goal.  Right?  We become focused, we become motivated by it to

10   the point where we are willing to do things that even hurt our

11   own reputation sometimes.  You know, it's not good, it's not

12   right, but it happens.

13       And when you contradict yourself under oath twice and

14   just openly swear, Yes, I'm going back on my word, that's

15   damage to your reputation.  And that's what we've seen from

16   Mr. Randel in this case.

17       We've also heard Mr. Randel come to the stand and

18   testify, and I think it went on for over an hour, about

19   polygons and rendering.  And I didn't really understand a lot

20   of it, but it was an hour plus of going through his patents.

21   Then again on cross examination by Ms. Marriott, what we hear

22   is that he's often confused about what his patents even cover.

23   Okay?  That's weird.  This is the person that, you know,

24   invented the technology, he prepared his patent applications,

25   he went to the trouble of filing his patent applications, and

1  then he's confused about what they cover.  That doesn't seem

2  right.  He admits to being wrong about what his patents cover.

3  That's got to go in the bucket to assess does this smell

4  right.  When I'm applying my common sense, does this smell

5  right.

6      He also admitted, as I said he would in opening, that he

7  hasn't used his patented invention since 2000; that he stopped

8  using it just a year after he filed his patents.  Now,

9  Mr. Buether tells you to just ignore that fact.  'I hope you

10  ignore it' were his words.  Well, why in the world would you

11  ignore that fact?  We're talking about the credibility of the

12  case here.  Again, what the Plaintiffs are shoveling in your

13  direction, what they are asking you to believe is that Sony in

14  2018 went back over 20 years to pick up a technology that

15  Mr. Randel on the screen in front of you admits that he

16  stopped using.  That's a hard story to swallow.  And no, don't

17  ignore that story; factor it into your credibility of

18  Plaintiffs' case of Mr. Randel's testimony.

19      Now, Doctor Lastra, he can't do that.  When he's on the

20  stand he's testifying as an expert.  Right?  He's giving you

21  facts.  He's giving you evidence.  He doesn't consider things

22  like this.  You do.  That's the role of the jury to weigh

23  credibility, not Doctor Lastra.  So when Mr. Buether cross

24  examines him and says, You didn't consider the fact that this

25  happened in 2000, Doctor Lastra's perfectly right to say, No,

1    I did not; that's not my analysis.  I'm giving them facts

2    about the infringement case.  That's your guys' analysis to

3    consider these type of facts.  That's what you do.

4         And one last thing.  You'll see in the instructions on

5    credibility that a witness' memory is relevant to their

6    credibility.  You remember seeing Mr. Heptig, the gray-haired

7    gentleman two rows back?  You got a four-minute clip by him in

8    our case by deposition.  Okay?  Do you remember that clip?

9    This is what he said.  Again, Mr. Randel's confusion they are

10   trying to brush away.  Well, Mr. Randel has a bad memory.  So

11   that's his team saying he has a bad memory.  So factor all

12   those things in when you're considering Mr. Randel's testimony

13   and how much weight to give it.

14        Again, I contend that it's not an ounce of weight in the

15   Plaintiffs' favor.  It's not credible.  It just doesn't smell

16   right.

17        Finally I want to talk about Doctor Hart for just a few

18   minutes.  Doctor Hart is the witness -- I don't see hem here

19   in the courtroom today, but he's the witness with the detailed

20   infringement analysis.  Do you remember the leaning tower of

21   Pisa that I built as I was cross examining him?  That was his

22   detailed infringement analysis, all those addenda that we were

23   talking about, and he didn't write a word of it; didn't do an

24   ounce of the preparation of that detailed infringement

25   analysis.  He adopted it without a single substantive change

1    from Mr. Buether.  6,000 pages plus of analysis from

2    Mr. Buether; didn't even bother to take the Buether law firm

3    logo off the front page of his analysis.  It shouldn't be

4    surprising, then, that when Doctor Hart does his analysis, he

5    starts citing to source code that's not active.  Okay?

6        Now, Mr. Buether tries to back away from that error, that

7    mistake that they made by saying, Well, Sony didn't show you

8    the source code.  Well, Mr. Hastings told you straight up that

9    that source code is not active.  Do you believe him?

10       Now,      Mr. Hart, who again -- sorry.  Mr. Hart's not

11   here, but he took the stand in rebuttal case just yesterday

12   afternoon and he could have corrected it if that was in the

13   source code; hey, doesn't take but five minutes to show us how

14   that works and make sure that the mistake was not made.  He

15   didn't do anything.

16       We told you what the truth was.  He made a mistake and

17   it's not surprising that he made a mistake because he didn't

18   do the work.  He took it from Mr. Buether.  He took a

19   shortcut.  The technical expert did not do his own work, so

20   you need to weigh that in terms of credibility when you

21   consider Doctor Hart.

22       Doctor Hart is also the witness who stood in front of you

23   and said this PlayStation Vita infringes.  Now, that's not in

24   the case anymore, they've moved that out of the case, but that

25   doesn't let Doctor Hart off the hook.  Okay?  Because, again,

1    he stood up in court, raised his right hand, swore to tell the

2    truth, the whole truth, and nothing but the truth, got on that

3    stand and said that the PlayStation Vita infringes because the

4    hardware in this handheld device is the same hardware in this

5    PS4.  That was his testimony.  Remember that?  I held them

6    both up and he said, Yes, they're the same.  This thing must

7    be pretty empty if it has the same hardware as this one.

8    That's the kind of thing that goes to credibility.  It's just

9    not believable.

10       And secondarily, the fact that he would testify to that,

11   even though it's now withdrawn, but that he would testify to

12   that, it tells you where his testimony is coming from.  It

13   tells you about the man.  He'll say what Mr. Buether tells him

14   to say when he tells him to say it.  That's Doctor Hart.

15       Finally, you saw yesterday that Doctor Hart tried to give

16   you a construction, an understanding that was contrary to the

17   Court's construction.  You don't do that in a case unless --

18   I'll let you figure that out.  You don't do that in a case

19   unless you are in a desperate situation.  Okay?  It just

20   doesn't happen.  But to have him do that, what we saw

21   yesterday, and then to say that it's Doctor Lastra who's not

22   applying the Court's claim construction faithfully, that's

23   humorous.

24       So weigh the evidence.  As you look at the scales, I

25   contend that the evidence on the Plaintiffs' side, Doctor Hart

1    Mr. Randel, Mr. Perry, that evidence don't smell right.  Okay?

2    I contend there's not an ounce of credible evidence on the

3    Plaintiffs' side of the scale.  And I'll back away.  It's your

4    guys' job; I'm just giving my opinion that's what I saw, but

5    it's your eyes that count.  But I'd ask you to do that

6    weighing, assess that credibility.

7        Now, there's one other question that we've addressed in

8    this case, the whole well-known, routine, and conventional

9    stuff.  There's a question that you're going to be presented

10   with, and this is Question 2 on your verdict form.  Okay?  I

11   want to be very clear about what we're asking you here.  This

12   reads that the asserted claims only involve technologies and

13   activities that were well-understood, routine, and

14   conventional from the perspective of a person of ordinary

15   skill in the art as of March 12th, 1999.  That's the question.

16       Now, we are not saying -- let me be clear about what we

17   are not saying.  We are not saying that Mr. Randel didn't

18   invent his method.  Okay?  We're not saying somebody did it

19   before.  That's not what we're saying.  In fact, I will tell

20   you openly, I don't know of anybody who did his method before

21   him.  I don't know of anybody who did his method after him.  I

22   don't think anybody else did his method.  In fact, I think

23   Mr. Randel stopped doing his method.  Okay?  What this

24   question is asking you is, is the activities involved in his

25   method routine and conventional.  That's the question; not did

1    somebody do it before.  We're not showing you documents to

2    prove somebody did it before; just is it routine and

3    conventional.

4        Here's the thing.  Doctor Hart, that providing lighting

5    data, providing observer data, and then that comparing step

6    which was called shadow mapping, Doctor Hart agreed with me.

7    That is all known since the '70s.  Okay?  Those first three

8    pieces of the claim.

9        The last two pieces of claim, the storing limitation and

10   the combining that we've talked predominately about in this

11   case is just mathematics.  Okay?  You got to add the light

12   falling on the region.  That's plus, plus, plus.  And then you

13   got to combine.  That was multiplication.  Take what you've

14   clumped together and multiply it by some information about

15   your perspective.  So addition, followed by multiplication.

16   That's our point.  That's all we're saying.  Computers have

17   been doing addition and multiplication since the first

18   computer.  That's what they do.  Nothing about those

19   activities are anything but routine and conventional.

20       And by the way, on that question, you didn't hear Doctor

21   Hart in the rebuttal case, which is where he was supposed to

22   address that, didn't say a word about it.  It's just

23   mathematics.  That's our point on Question No. 2.

24       But I will tell you that while that question is

25   important, it's this question that matters to Mr. Hastings and

1    Mr. Hobson.  They came here, as I told you at the start,

2    because they've been wrongly accused.  They did not take

3    Mr. Randel's technology from 20 years ago.  They just didn't

4    do it.  And they came here; they told you that.

5         We've presented our case.  This is the time for justice.

6    This is the time to vindicate them and clear their names.

7    This is the important thing to Mr. Hastings and Mr. Hobson.

8    And you will vindicate them.  You will clear their names by

9    answering 'no' to Question 1 about infringement; 'no' straight

10   down the line, because they didn't do it.  As I told you at

11   the start, that's what we're asking for, that's the important

12   question, and I'd ask you to check 'no' as you've completed

13   your deliberations.

14              THE COURT:  Your time is expired, counsel.

15              MR. BURESH:  Thank you.

16              THE COURT:  Mr. Buether, you may now present

17   Plaintiffs' final closing argument.  You have 8 minutes and 23

18   seconds remaining.  As you've requested, I'll warn you when

19   you have two minutes left.

20              MR. BUETHER:  Thank you, Your Honor.

21              THE COURT:  Please proceed.

22              MR. BUETHER:  Well, let's see.  What has Sony's

23   counsel accused Mr. Randel of being and the whole team that

24   have represented him in this case?  Making stuff up,

25   presenting straw man arguments, lacking credibility.

1    According to Sony, Doctor Hart will say anything I tell him.

2    Didn't strike me as that kind of a fellow, but that's what

3    they're telling you.  Mr. Randel's a liar, not credible at

4    all, nothing we've presented is credible.

5        I agree with Mr. Buresh on one thing.  I'll let you apply

6    your common sense and good judgment to make the determination

7    about whether any of that is true.

8        But the bottom line here is that Mr. Randel made a

9    bargain with the government 20 years ago and said, I'll

10   disclose what I consider to be an invention, which Sony now

11   doesn't question it's an invention, and you'll -- I'll

12   disclose this to the public, and in 20 years it's the public's

13   and I have no right to stop anybody from using it; but within

14   that 20-year period, I get to stop others from using it

15   without my permission.  It's wrong for somebody to use it

16   without my permission.  And all we are asking you today is to

17   make sure that Sony honors its bargain not to violate the law.

18       And so it reminds me of the story I heard one time about

19   an old man and a little kid, smart aleck kid, kind of thought,

20   I'll play a joke on the old man.  I'll capture a bird.  And

21   I'll walk up to the old man and I'll hold the bird in my hand

22   and ask him if the bird is alive or is it dead.  And if the

23   old man says it's dead, I'll open my hand and let the bird fly

24   away and I'll prove him wrong; and if he says it's alive, I'll

25   crush that bird and prove him wrong anyway.

1    And so I would submit that Mr. Randel's kind of like that

2    bird, and you're the jury that has him and his hopes and

3    aspirations in your hand.  And so when you go to retire to

4    deliberate, we ask you to treat him fairly, as well as Sony,

5    and do the right thing.

6        And with that, I thank you and hope you do the right

7    thing.  Thank you very much.

8            THE COURT:  All right, ladies and gentlemen, I'd now

9    like to provide you with a few final instructions before you

10   begin your deliberations.  You must perform your duty as

11   jurors without bias or prejudice as to any party.  The law

12   does not permit you to be controlled by sympathy, prejudice,

13   or public opinion.  All parties expect that you will carefully

14   and impartially consider all the evidence, follow the law as I

15   have given it to you, and reach a just verdict, regardless of

16   the consequences.

17       Answer each question in the verdict form based on the

18   facts as you find them to be, following the instructions that

19   the Court has given you on the law.  Again, do not decide who

20   you think should win and then answer the questions accordingly

21   to reach that result.  I remind you once more, your answers to

22   those questions and your verdict in this case must be

23   unanimous.

24       You should consider and decide this case as a dispute

25   between persons of equal standing in the community, of equal

1   worth, and holding the same or similar stations in life.  This

2   is true in patent cases between corporations, partnerships,

3   business entities, and even individuals.  A patent owner is

4   entitled to protect his rights under the laws of the United

5   States, and this includes bringing a suit in a United States

6   District Court for infringement.  The law recognizes no

7   distinction among types of parties.  All corporations,

8   partnerships, other business organizations, and individuals

9   stand equal before the law, regardless of their size,

10  regardless of who owns them, and they are to be treated as

11  equals.

12      Now, when you retire to the jury room to deliberate on

13  your verdict, as I've told you, you are each going to have a

14  written copy of these final jury instructions to take with you

15  that I'm giving you orally now.  If during your deliberations

16  you desire to review any of the exhibits which the Court has

17  admitted into evidence over the course of the trial, you

18  should advise me by a written note delivered to the Court

19  Security Officer and signed by your foreperson.  I'll then

20  send you that exhibit or those exhibits.

21      Also, once you retire, you should first select your

22  foreperson and then conduct your deliberations.  And if you

23  recess during your deliberations for any reason, follow all

24  the instructions the Court's given you about your conduct

25  during the trial.

1          After you have reached a unanimous verdict, your

2     foreperson is to fill in those unanimous answers to the

3     questions in the verdict form reflecting your unanimous

4     decision.  You should not reveal your answers until such time

5     as you're discharged by me or unless I direct you otherwise,

6     and you must never disclose to anyone, not even to me, your

7     numerical division on any question.

8          Any notes that you've taken over the course of the trial

9     are aids to your memory only.  If your memory should differ

10    from your notes, then you should rely on your memory and not

11    your notes.  The notes are not evidence, ladies and gentlemen,

12    and a juror who has not taken notes should rely on his or her

13    own independent recollection of the evidence produced during

14    the course of the trial and not be unduly influenced by the

15    notes of other jurors.  Notes are not entitled to any greater

16    weight than the recollection or impression of each juror about

17    the testimony.

18         If during your deliberations you want to communicate with

19    me at any time, you should give a written message or question

20    to the Court Security Officer written and signed by your jury

21    foreperson.  The Court Security Officer will then bring it to

22    me and I will respond as promptly as possible either in

23    writing or by having you brought back into the courtroom where

24    I can address you orally.  I will always first disclose to the

25    attorneys in the case your question and my intended response

1    before I answer your question.

2         Now, after you have reached a unanimous verdict and I

3    have accepted that verdict and discharged you from your

4    position as jurors in this case, I remind you, you're not

5    required to talk with anyone about your service in this case,

6    but at that point when I've discharged you as jurors, by the

7    same token, you will be completely free to discuss your

8    service in this case with anyone of your choosing.  That

9    choice at that time, ladies and gentlemen, will be up to you;

10   100 percent your choice.

11        I'm now going to hand eight printed copies of these final

12   jury instructions and one clean copy of the verdict form to

13   the Court Security Officer who will deliver them to you in the

14   jury room.

15        Ladies and gentlemen, you may now retire to the jury room

16   to deliberate upon your verdict.  We await your verdict.

17             (Whereupon, the jury left the courtroom.)

18             THE COURT:  Counsel, you are welcome to wait here in

19   the courtroom.  If you elect to wait outside the courthouse,

20   make sure before you leave the courtroom that my clerks have a

21   good working cell phone number for a representative of both

22   Plaintiffs' trial team and Defendant's trial team so that upon

23   receipt of a note or return of a verdict we can get you back

24   here shortly.

25        Awaiting either a note from the jury or a return of their

1    unanimous verdict, the Court stands in recess.

2                    (Jury deliberates.)

3                    THE COURT:  Be seated, please.

4        Counsel, I've received the following note from the jury:

5    "We, the jury, have reached a verdict."  And I'm told it's

6    signed by Juror No. 3 Mr. Reeher who is the apparent

7    foreperson of the jury.

8        I'll hand the original note to the courtroom deputy to be

9    included in the papers of this case.

10       Let me remind all present that the Court will not expect

11   any outward reactions to whatever the verdict is.

12       Let's bring in the jury, please, Mr. Latham.

13                   (Whereupon, the jury entered the courtroom.)

14                   THE COURT:  Please be seated.

15       Mr. Reeher, I understand that you are the foreperson of

16   the jury.  Is that correct?

17                   THE PRESIDING OFFICER:  Yes, sir.

18                   THE COURT:  Has the jury reached a verdict?

19                   THE PRESIDING OFFICER:  Yes, sir.

20                   THE COURT:  Would you hand the completed and signed

21   verdict form to the Court Security Officer who will bring it

22   to me?

23       Ladies and gentlemen of the jury, I am going to announce

24   the verdict into the record at this time, and I'm going to ask

25   each member of the jury to listen particularly closely as I do

1   that because after I've announced the verdict into the record,

2   I'm going to poll the jury to make sure that this is, in fact,

3   the unanimous verdict of all eight members of the jury.

4       Turning to the verdict form and turning to page 4 of the

5   verdict form where Question 1 is found, "Do you find that

6   Plaintiffs have proven by a preponderance of the evidence that

7   SIE, the Defendant, has infringed any of the following

8   asserted claims of the Patents-in-Suit as indicated below?

9       "Answer 'yes' or 'no' for each accused product as to each

10  asserted claim."

11      As to claim 1 of the '822 Patent and the Spider-Man

12  accused products, the jury's answer is no.

13      As to the God of War accused products regarding claim 1

14  of the '822 Patent, the jury's answer is no.

15      As to claim 1 of the '488 Patent regarding the Spider-Man

16  accused products, the answer is no.

17      As to the God of War accused products relating to claim 1

18  of the '488 Patent, the jury's answer is no.

19      As to the Spider-Man accused products regarding claim 27

20  of the '488 patent, the jury's answer is no.

21      As to the God of War accused products regarding claim 27

22  of the '488 Patent, the jury's answer is no.

23      As to the PlayStation 3 products regarding claim 50 of

24  the '488 Patent, the jury's answer is no.

25      And as to the PlayStation 4 products regarding claim 50

1    of the '488 Patent, the jury's answer is no.

2         Turning to Question 2 on page 5, "Did Defendant SIE prove

3    by clear and convincing evidence that the asserted claims

4    involve only technologies and activities that were

5    well-understood, routine, and conventional from the

6    perspective of a person of ordinary skill in the art as of

7    March the 12th, 1999?"

8         For claim 1 of the '822 Patent, the jury's answer is yes.

9         As to claim 1 of the '488 Patent, the jury's answer is

10   yes.

11        As to claim 27 of the '488 Patent, the jury's answer is

12   yes.

13        And as to claim 50 of the '488 Patent, the jury's answer

14   is yes.

15        Turning, then, to the next page, being page 6, which is

16   the final page of the verdict form, I note for the record that

17   it is dated today's date, October the 7th, 2021, and it is

18   signed by Mr. Reeher as the foreperson of the jury.

19        Ladies and gentlemen of the jury, let me poll you to make

20   sure that this verdict, as I have announced it into the

21   record, reflects the unanimous decision of all eight members

22   of the jury.

23        If this is your verdict as I have read it, would you

24   please stand up?  Thank you.  Please be seated.

25        Let the record reflect that all eight members of the jury

1    immediately rose and stood in response to the Court's question

2    to poll the jury.

3        I find, based on that, that this is the unanimous verdict

4    of all eight members of the jury, and I will deliver the

5    original verdict form to the courtroom deputy.

6        Ladies and gentlemen, this now completes the trial of

7    this case.  From the very beginning I've instructed you time

8    and time again about not discussing this case with anyone.

9    I'm now releasing you from that obligation and from all the

10   obligations and instructions that I have given you about your

11   conduct as jurors in this case.  I am discharging you as

12   jurors in this case.  That means you are free to talk with

13   anyone you'd like to about your service in this case.  It also

14   means that you are free not to talk to anyone about your

15   service in this case.  The decision is yours and yours alone.

16       I will tell you that the practice in this court has been

17   for decades, it was well-established when I got here out of

18   law school a long time ago, that when a jury returns a verdict

19   in this court, the lawyers and the parties in the case are not

20   permitted to approach you and to initiate a conversation about

21   your service.  However, if you should choose to initiate a

22   conversation with anyone related to any of the parties or the

23   sides in this case, you are free to do that, but it's your

24   decision, not theirs.

25       Historically, that has meant that the lawyers typically

 1    find a way to get to the front steps of the courthouse before

 2    you leave, and as you walk down the front steps they happen to

 3    be there in hopes that you will decide to stop and talk to

 4    them.  If that's what you'd like to do, feel free to stop and

 5    talk as long as you'd like.  If you would not prefer to do

 6    that, then, equally, just smile and walk by.  They are not

 7    going to engage you in a conversation unless you start it.

 8    That's the way it's always worked here and I expect that's the

 9    way it will work this time.

10        I will let you know, I have added one little addition to

11    that practice in the last several years, and that is I'm going

12    to furnish to you in a few minutes a slip of paper, if you

13    want it, that has a representative's cell phone number on it

14    for somebody from the Plaintiffs' trial team and somebody from

15    the Defendant's trial team, and if you'd like to take that

16    with you, you are welcome to; if you don't want to take it

17    with you, you don't have to.

18        If you take it with you and you decide tomorrow, next

19    week, next month, whenever, you'd like to have a conversation

20    with one side or the other side or both, dial that cell phone

21    number.  I promise you they'll be interested; they'll like to

22    hear what you have to say.  But they won't call you.  They

23    won't initiate a conversation.  It's up to you.

24        But to make it so that you don't feel like you have to

25    either speak now or forever hold your peace when you walk down

1    the front steps of the courthouse, you'll be able to take a

2    cell phone number for each side with you, if you'd like, and

3    if in your own discretion at a later time if you'd like to

4    call and discuss your experience on this jury with either or

5    both sides, you'll be free to do that.  But again, ladies and

6    gentlemen, let me stress to you that it's 100 percent your

7    decision and nobody is going to contact you that you don't

8    choose to initiate the conversation with first.

9        Also, ladies and gentlemen, I want you to know how much

10   the Court appreciates your service in this case, and I speak

11   for everybody in this room when I say that.  We all understand

12   that our system of justice, including the constitutionally

13   guaranteed right of a trial by jury in a civil case, rests on

14   the ability of ordinary citizens to make themselves available

15   to present themselves for service and to undergo the

16   unavoidable sacrifices that it takes to serve as a juror in a

17   case like this.  Everybody in this room outside the jury box

18   recognizes that and appreciates that and values that, and I

19   can't stress that enough.

20       I'd like to ask you to do me a personal favor.  In a

21   moment I'm going to excuse you from the jury box, and when

22   that happens, if you would, I'd like you to go back in the

23   jury room and let me come down off the bench and meet you in

24   the jury room.  I'd like to look each one of you in the eye

25   and I'd like to tell you to your face how much the Court

1    appreciates your service.  I have a letter of appreciation and

2    a certificate from the Court of appreciation regarding your

3    service I'd like to give to each one of you.

4        I will not keep you, but if you would do me that honor, I

5    promise to take just a minute or two of your time, but I'd

6    like to thank you in person because, quite honestly, in my

7    opinion, what you have done warrants that, and the Court would

8    be remiss if it did not do more than just simply say thank

9    you.

10       So if you're willing to do that and if you will afford me

11   that privilege, and I consider it a privilege, I will meet you

12   in the jury room in just a moment, and I will give you those

13   letters and certificates and thank you personally.

14       As I noted, you are discharged as jurors in this case,

15   the Court accepts your verdict, and that completes the trial

16   of this case, and you're excused to the jury room.

17            (The proceedings were concluded at 2:04 p.m.)

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts              10/07/2021

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR
11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25